THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EUGENE LEWANDOWSKI, Defendant-Appellant.

Second District (2nd Division)   No. 75-339

Opinion filed November 15, 1976.

Berle L. Schwartz, of Highland Park, for appellant.

William J. Scott, Attorney General, of Chicago, and Jack Hoogasian, State's
Attorney, of Waukegan (Steven J. Rosenberg, James B. Zagel, and Jayne A. Carr,
Assistant Attorneys General, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:
The defendant was charged with conspiracy to commit theft of
property having a value in excess of $150 (Count 1) and with theft of
property worth in excess of $150 (Counts 2 through 11). He was convicted
by a jury and sentenced to serve 5 years' probation and pay a fine of
$2,000.

The circumstances of the case are quite unusual. The defendant
became employed by Lake Forest College in 1958 and was purchasing
agent for the college from 1960 until 1974. He testified that his duties
included making decisions as to what property should be bought or sold.
One of his co-defendants, Fred Clavey, who had previously been in
charge of the grounds at the college, but who left the college in 1971,
testified that he visited with the defendant in March or April of 1973 at the
college and during a conversation with the defendant over a cup of coffee

he suggested to the defendant a plan whereby Clavey would use the Federal Surplus Property program, in which the college was participating, to make purchases on behalf of the college of property which would qualify for secondary utilization and could be resold at a profit. Clavey said he would undertake to obtain for the college a profit of at least 10% over and above the "service charge" (purchase price) made by the State for such surplus property.

At this point it is perhaps desirable to outline briefly the practices and regulations adduced by the testimony as to the Federal Surplus Property program. As explained by witness Dale Wilson, Director of the Office of Surplus Property (Department of Health, Education and Welfare), all government property no longer needed by the government is reported to the General Service Administration. If no use is found for the property it is reported to the Office of Surplus Property Utilization for allocation to State agencies for health, education and civil defense programs. The State agencies are then responsible for distributing the property to eligible institutions or donees within the State to be used for health, education and civil defense, eligible donees being tax exempt schools, universities and colleges, hospitals, clinics, health and civil defense centers. The State places the surplus property which has been allocated to it in various warehouses throughout the State and the donees come to the warehouse, inspect and select the property they want, sign the required documents (either at the warehouse or later) and take possession of the property. A nominal "service charge" is made and apparently some institutions which have previously been qualified have identification cards and maintain an account with the particular warehouse operated by the State.

After the selection is made an invoice describing the actual property selected by the donee's agent or employee at the warehouse is filled out by a warehouse employee, describing the property, which invoice shows the Illinois serial number, a general description of the property, the unit acquisition cost (original cost to the government) and the service charge. The property is then either shipped to the donee or picked up by such donee. The invoice is sent in duplicate to the donee's authorized agent who signs and returns one copy.

On the back of the invoice are set forth certain regulations. Those pertinent to this decision may be summarized as follows:

(1) That the donee certifies it is an eligible institution as defined by law and that the property requested is useable and necessary for education or health purposes in the State.

(2) That the property will be used for the purpose for which acquired within 12 months of purchase. Property having an original acquisition cost of less than $2500 must be used for 1 year and property having an acquisition cost of over $2500 must be used

for 4 years, unless otherwise permitted by the Department. During these restricted periods the property shall not be sold, leased, traded, loaned or otherwise disposed of without the prior written approval of the Department of Health, Education and Welfare. At the bottom of the reverse side of the invoice appears in large print the following:

> "Notice: Prior authority must be obtained from the Department of Health, Education and Welfare before an item with an acquisition cost of $2500 or more can be cannibalized for component parts or dismantled for secondary utilization."

There is no definition of "secondary utilization" on the invoice and the meaning of this phrase became a critical question during the trial. It will be recalled that in the discussion between Clavey and the defendant, Clavey proposed that the property to be purchased from the Surplus Property warehouse be utilized for sale as "secondary" property (more properly referred to as secondary utilization).

Following his conversation with the defendant at the college in early April, 1973, Clavey testified, he proceeded to obtain certain machinery and tools ostensibly to be used for Lake Forest College from the State warehouse. While the property was represented to the Illinois warehouse employees as being acquired for the use of Lake Forest College, secondary utilization was requested and Clavey then proceeded to sell the property to a dealer in used machinery.[1] It appears that the dealer in question, Raco Industrial Corporation, dealt both with Clavey and with John Monahan. Clavey testified that he acted entirely on his own and that Lewandowski never knew what surplus machinery he was buying, or where and when he disposed of it, or for what price. Clavey did not sign any invoices. The invoices were made up at the State warehouse showing Lake Forest College as the purchaser and were sent to the attention of Mr. Munshower, the college business agent, or to the defendant, and the invoices were all signed by the defendant. No charges were paid by Clavey, who simply picked up the selected machinery, took it to Raco, and sold it.

Both Clavey and the defendant testified there was never any agreement between him and the defendant for a division of the proceeds of the sales; that the defendant did not know what price Clavey received for the property, or indeed, what property had been sold. The defendant testified he was never aware that Clavey had gotten more for the property than he gave the defendant. He denied that he had ever kept any of the

---

[1] It should also be pointed out that it was stipulated that requested "secondary utilization" designation was approved by the United States Department of Health, Education and Welfare in each instance.

proceeds for himself. His testimony was that he held the invoices until Clavey brought him the money for the article covered, and that he then reimbursed the college for the "service charge" and deposited the remainder (the profit to the college) in a fund he had started some years prior known as the "Garage Fund," a fund belonging to the college and made up primarily of donations solicited by the defendant.

The defendant, while admitting he had dealt with surplus property for over 10 years and had "once or twice" during this time, read the conditions appearing on the back of the invoice, denied he had exerted unauthorized control over any property. He said that he was under the impression he had authority to exercise the control he did, since it was his understanding that approval for "secondary utilization" meant that the donee could dispose of the property in question in any manner desired, including selling or destroying the property.[2]

It appears from the evidence that $19,200 was paid by Raco for the surplus property it bought from Clavey and Monahan. The defendant testified that he had received (from Clavey) about $12,050. Of this he deposited about $10,000 in a general college account to repay the cost of the service charge and that he deposited the profit, approximately $2,050, in a "Garage Fund" account. While the college discharged the defendant before the trial started there is no evidence that the college suffered any financial loss due to the transactions described.

This appeal raises three issues—whether the evidence was sufficient to convict the defendant beyond a reasonable doubt; whether the verdict was the result of passion and prejudice induced by improper argument and evidence; whether the court erred in refusing to give certain of the defendant's proffered instructions.

The difficulty in resolving this case arises not so much from the complexities of the case itself—although the relationship between the college, the State of Illinois, the Department of Health, Education and Welfare, the vendee of the surplus property, and the defendant, doubtless offers some complexities—but rather the real difficulty is with the

---

[2] The defendant's actual testimony on this point was as follows:

"Q. (by Mr. Schwartz, defense attorney). Now, Mr. Lewandowski, you became familiar, I believe, with secondary utilization.

A. Yes, I have.

Q. What was in 1973 and is now your understanding of the meaning of that term?
A. They explained to me all the years I have been involved with it, through Mr. Anderson and different members of the Federal Surplus and Gaspari, anything that was secondary, slashed cannibalization type of merchandise was in a sense junk. For any reason we could use the merchandise for and if we couldn't use it to dispose of it, which was my authority as presented in the purchasing manual.

Q. And we are talking about the same Mr. Gaspari about whom the other witnesses testified was once the director of the State of Illinois Federal Surplus Property Section?
A. Same as Mr. Gaspari, correct."

evidence itself. It is so full of contradictions, inferences and unresolved questions that a logical and orderly sequence of events and a fair and objective appraisal of motives and intentions is almost impossible to achieve without filling in certain gaps by our own speculation. This, of course, we cannot do since we are bound by the record before us. Nor can we believe that the jury was any more enlightened as to certain key questions than ourselves, even though it arrived at a verdict. The State, for example, chose to prosecute the case on the charge of theft and conspiracy to commit theft, a case based almost entirely on inferences from certain peculiar circumstances, in spite of the fact that the inferences derived from defendant's acts were refuted by the direct testimony of Clavey, the State's own witness and the alleged co-conspirator.

There was little or no testimony as to the formation or initiation of a conspiracy—from all that the testimony told us there was only an inconclusive conversation opened to inferences of a scheme to defraud but equally open to an innocent construction. We can only conclude that the State's failure to pin the conversation down to something more incriminating was due to the fact that Clavey did not choose to reveal his true intention to the defendant at the time of that conversation and therefor deliberately left the defendant in the dark as to his intentions. If this is true then we are reduced to speculation on the degree of the defendant's naivete in order to determine whether or not the jury was justified in inferring guilt from the admitted circumstances alone. Again, it would be logical to suppose that some discrepancies favorable to the prosecution would be found in the records of the college as to how and when deposits were made in its account vis-a-vis the Illinois Surplus Property account. Allegedly deposits were made in cash sums by the defendant to the college account, but the dates, allocation and number of these deposits were never brought to light. It must be assumed, however, that the records were in accord with the defendant's testimony since nothing to the contrary was established by the evidence.

Even the interpretation of the phrase "secondary utilization" was unresolved although its meaning was of critical importance in determining whether the defendant *knowingly* exerted *unauthorized* control over the surplus property obtained by Clavey on defendant's authorization. If, as contended by the State and testified to by Wilson, the director of the Department of Health, Education and Welfare Surplus program, the phrase meant only that the property in question could be used for purposes other than originally manufactured for and in no event sold or otherwise disposed of during the period of restriction indicated on the back of the invoice, then the defendant's conduct in authorizing acquisition of the property in the name of the college with the intention of

immediately selling it to any willing buyer, might reasonably be interpreted as aiding and abetting unauthorized control over the property. If, on the other hand, the phrase was generally accepted as giving authority to the donee to dispose of the property to donee's best advantage, whether by cannibalization, tradein or sale, then, at least so far as the defendant's state of mind was concerned, the intention to exert unauthorized control was not established since authority for "secondary utilization" *was* secured from the Department of Health, Education and Welfare on the form known as form "484." Wilson's own definition of the phrase was impeached by a record of a conversation given in an official report of the Illinois Bureau of Investigation wherein Wilson explained the meaning to one of the investigators in much more liberal terms. In fact, Wilson, according to the investigator, said that permission for secondary utilization voided the restrictions (as to sale or other manner of disposal) on that piece of property. An official definition of the phrase, as set forth in HEW regulations, however, was never produced so that the proper meaning of this key phrase was left dangling like the sword of Damocles over the defendant's head.

■■ Undeniably, the events set in motion by the defendant's authorization to Clavey to buy property in the name of the college for immediate resale, precipitated a fraud on the Department of Health, Education and Welfare, the State of Illinois and possibly the college. His action in so doing showed inexcusably bad judgment, if nothing worse. But that it was criminal was not established by the evidence at trial beyond a reasonable doubt. Circumstantial evidence is perfectly good evidence and can certainly be a basis for a conviction. (*People v. Branion* (1970), 47 Ill. 2d 70; *People v. Bernette* (1964), 30 Ill. 2d 359; *People v. Russell* (1959), 17 Ill. 2d 328.) The rule has been applied in cases where the charge was aiding and abetting. In *People v. Cannon* (1974), 18 Ill. App. 3d 781, in confirming a conviction for unlawful use of weapons, the court said, page 786:

" ' * * *[T]here is no legal distinction between direct and circumstantial evidence as to the weight and effect thereof.' [Citation.] Any fact provable by direct evidence may also be proved by circumstantial evidence. In addition, upon another theory, circumstantial evidence may prove the existence of a common design to do an unlawful act and to show that the defendant assented to the commission of a crime and therefore aided and abetted."

But, the qualifying language of our Supreme Court in the *Branion* case cited above must not be overlooked either:

"To support a conviction based on circumstantial evidence it is

essential that the facts proved be not only consistent with defendant's guilt, but they must be inconsistent with any reasonable hypothesis of innocence." 47 Ill. 2d 70, 77.

■■ In the case before us, due to the dearth of the evidence and the unresolved questions, a reasonable hypothesis of innocence was not rebutted. It is not inconceivable, given the casual background of the Illinois Surplus Property Administration and the uncertainty surrounding HEW requirements, that the defendant could honestly have believed he was not outside his authority as the college purchasing agent, in authorizing the sale of property to which the "secondary utilization" category had been applied. Had there been proof of unlawful gain to the defendant or an overt conspiracy to obtain unlawful profits, the inference flowing from the defendant's misguided acquiescence in Clavey's scheme would be greatly strengthened. But there was no such evidence adduced and Clavey positively rebutted the inference of defendant's participation in any illegal gain by testifying that he did not have any agreement with the defendant as to any personal gain to either, did not divulge his intentions to immediately "cash in" on the donated surplus property and that he did not share any of the profit with the defendant.

Clavey's testimony, together with the uncertainty surrounding the rules governing the disposal of property designated for "secondary utilization," provide a reasonable hypothesis of defendant's innocence. We are persuaded that he was not proven guilty beyond a reasonable doubt on either the theft charges or the conspiracy charge.

In our view the motion for a directed verdict should have been granted. We therefore find it unnecessary to discuss the other points raised in this appeal.

The judgment of the circuit court of Lake County is reversed.

Judgment reversed.

T. J. MORAN, P. J., and SEIDENFELD, J., concur.