# Illinois Official Reports

## Appellate Court

---

### *People v. Oglesby*, 2016 IL App (1st) 141477

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARLA OGLESBY, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-1477 |
| Filed | December 15, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-21241; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part, and remanded. |
| Counsel on Appeal | Cynthia Giacchetti, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Miles Keleher, and Samantha N. Lemke, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant Carla Oglesby was charged with several offenses related to the allegedly improper steering of government contracts between Cook County and various vendors, including two of defendant's own companies, that were formed while defendant was deputy chief of staff for the former president of the Cook County board of commissioners. Following a bench trial, the trial court acquitted her of many charges but found her guilty of two counts of theft, one count of money laundering, and one count of unlawful stringing of bids.

¶ 2 Defendant appeals, challenging the sufficiency of the evidence as to each count and the sentence imposed, and further argues that one of her convictions for theft must be vacated under the one-act, one-crime doctrine.

¶ 3 We affirm defendant's convictions for theft. The State presented sufficient evidence that defendant intended to permanently deprive the county of the use and benefit of its funds, that she obtained or exerted unauthorized control over the funds, and that she engaged in deception. We agree with both parties, however, that because both theft convictions were carved from the same act, one of the two convictions must be vacated under the one-act, one-crime doctrine. We remand to the trial court to determine which of the counts was less serious and should be vacated.

¶ 4 We affirm defendant's conviction for money laundering. The State sufficiently proved that defendant received a kickback from a vendor that was disguised as a legitimate transaction between two companies.

¶ 5 Finally, we affirm defendant's conviction for bid stringing. The State presented ample evidence that defendant improperly designated several vendor contracts in such a way to avoid a competitive bidding process so that the preferred vendor would receive the contracts without any competition.

¶ 6 I. BACKGROUND

¶ 7 Because defendant challenges the sufficiency of evidence as to each of her four convictions, it is necessary to examine the facts in great detail.

¶ 8 Cook County's main governing body is a board of commissioners. See generally 55 ILCS 5/div. 2-6 (West 2010) (laying out structure, powers, and duties of Cook County board of commissioners). The voters of Cook County select a president of the board from among the candidates for commissioner. 55 ILCS 5/2-6002 (West 2010).

¶ 9 At all times relevant to this case, Todd Stroger was president of the Cook County board of commissioners. Stroger hired defendant as his deputy chief of staff on February 16, 2010. Defendant was arrested in connection with this case on October 4, 2010.

¶ 10 The State's charges in this case related to several public contracts between various vendors that were ostensibly hired to perform public relations work for various departments in Cook County. The State charged defendant with organizing (counts I and II) and continuing (counts V and VI) a financial crimes enterprise, theft (count III), theft by deception (count IV), money laundering (count VII), official misconduct (counts VIII through XIV), and unlawful stringing of bids (count XV). After a bench trial, defendant was found guilty of theft, theft by deception, money laundering, and unlawful stringing of bids and acquitted of the other charges.

¶ 11                                  A. The Contracting Process, Generally

¶ 12      Generally, when Cook County contracted with outside vendors for services, those contracts were offered up for competitive bidding among various vendors. However, a department seeking the services of a particular vendor could seek a "sole-source contract," which was a contract to be performed by a specific vendor without competitive bidding. See Cook County Code of Ordinances § 34-139 (amended Mar. 12, 2014) ("Procurements of supplies, equipment, goods or services may be made without use of one of the competitive processes if there is either only one source or there is a need for the unique or specialized skill, experience, or ability possessed by a particular source.").

¶ 13      In order to obtain a sole-source contract, the head of the department seeking to use a particular vendor would complete a "justification letter"—a letter explaining why the department needed to use that particular vendor, instead of selecting a bidder through a competitive bidding process. See *id.* ("The Using Agency must submit a letter to the CPO justifying the sole source Procurement, and provide any other documents or information required by the CPO."). The letters were sent to the office of the purchasing agent.

¶ 14      In addition, contracts were usually submitted to the Cook County board of commissioners for approval. But during defendant's tenure, contracts valued at less than $25,000 did not need to be submitted to the board for approval.

¶ 15      Three other entities also had to sign off on a single source contract in order for it to be completed: the office of the purchasing agent, the comptroller, and the chief financial officer (CFO) of the county.

¶ 16                                          B. Contracts at Issue

¶ 17      The contracts at issue in this case were all formed between late February 2010 and mid-April 2010. They were ostensibly made to serve three projects: (1) a federal grant to assist individuals affected by a 2008 flood in suburban Cook County, administered through Cook County's department of homeland security; (2) a federal Department of Energy grant administered through Cook County's department of environmental control; and (3) a project to inform the public about the 2010 census to increase turnout.

¶ 18                                          1. Flood Grant Contracts

¶ 19      On February 24, 2010, eight days after defendant had been hired as deputy chief of staff, two justification letters were drafted for single source contracts relating to the flood grant. The letters were signed by David Ramos, the executive director of the Cook County department of homeland security, relating to two vendors who would work for the county on the flood grants: CGC Communications, LLC (CGC), and Gary Render. Although Ramos ran the department of homeland security, the justification letters were drafted on letterhead from the office of the president, *i.e.*, Stroger's letterhead.

¶ 20      Both justification letters said that CGC and Render would "work in conjunction with the Office of the President, the Board of Commissioners, and the Department of Public Affairs and Communications in the strategic implementation of media tactics designed to inform residents of suburban Cook County of" the flood grant. Both letters said that Ramos had selected these particular vendors because of "the vast experiences [they] possess[ ] in areas related, but not

limited to, strategic planning and [their] diverse background[s] in general consumer and multicultural media."

¶ 21 On February 26, 2010, the county issued checks to CGC and Render for $24,975 and $24,980, respectively. Bank records showed that CGC deposited the check in its account on March 1, 2010. Defendant had set up CGC's bank account, and it was undisputed that she controlled that account.

¶ 22 Ramos testified that Stroger appointed him to be the executive director of the department of homeland security in September 2009. Soon after his appointment, he learned that the county was "under the gun to disperse the [flood] grant funds." According to Ramos, if the county did not use the grant funds within a certain amount of time, the money would be returned to the federal government.

¶ 23 Ramos testified that it was part of his job to inform the public about the availability of the grant funds. Ramos spoke to Eugene Mullins, the head of Cook County's department of public affairs and communications (DPAC), about a public relations campaign.

¶ 24 Ramos testified that Mullins brought him the completed justification letters for CGC and Render. Ramos signed them, and he acknowledged that he did not review them "with a fine tooth [*sic*] comb." Ramos added, "I entrusted [Mullins] as DPAC Director that he was going to assist my department in getting the word out to the residents of Cook County." He also thought that DPAC would work with the vendors in performing the outreach.

¶ 25 Ramos said that he did not know anything about CGC or Render at the time he signed the letters. He did not know that defendant owned CGC. Ramos never spoke to defendant about these justification letters.

¶ 26 Prior to being hired as deputy chief of staff, defendant owned and operated CGC. Defendant listed CGC on a dual employment form she gave to the county at the beginning of her tenure. When defendant took on the job at Cook County, she asked Tesa Anewishki, who had been working for CGC as an independent consultant, to take over the responsibility of running CGC's day-to-day operations. Defendant remained in control of CGC's bank accounts, however, and was still its owner.

¶ 27 Anewishki testified that she was not employed by CGC; she worked as an independent consultant for the company from late 2008 until 2010.

¶ 28 Anewishki met Mullins in summer or early fall 2009. CGC was working on Stroger's reelection campaign at that time. Mullins said that he liked the way CGC worked, so he told Anewishki that he wanted CGC to work on community outreach projects for "all of these grant opportunities that people [in Cook County were] not applying for."

¶ 29 In December 2009, CGC was working for DPAC and Mullins on an outreach program informing residents of the county funds available for foreclosure relief. Anewishki testified that CGC provided DPAC with "strategic plans" for the foreclosure project. Anewishki explained what a media strategy was:

> "It's when you develop a plan based off of who your target audience is and you craft a plan to reach that audience. So you look at a media's [*sic*] demographic profile, psychographic profile if they are readers, as well as the service areas that the newspaper reaches."

Anewishki said that the point of this type of planning was to ensure that the target audience received the message so that Cook County would "get the most bang for [its] buck in terms of media."

¶ 30    From February 2010, when defendant started working at Cook County, until summer 2010, Anewishki was in charge of CGC. But she still did not work there full-time; she kept her own clients. Defendant still owned the company, but Anewishki was in charge of billing, banking, and payroll.

¶ 31    Anewishki testified that, in early 2010, Mullins said that CGC would start work on an outreach program for the flood grant. Anewishki testified as to the work she did on the flood grant project:

> "Well, I continued doing research. So I did the research on the flood areas that were the high risk and the mid risk impact areas regarding the floods, looking at the—continuously doing the communications audit, giving him recommendations, coming up with key messaging, giving him media targets to go after in terms of promoting the programs, you know, fliers. It was really about grasp reach based off of the demographic [*sic*] and population. You can't do things globally. You have to do things very grass root [*sic*] oriented. So giving [Mullins] the recommendations of how to reach those audiences."

¶ 32    She also said that she performed a "communications audit" for the county, which consisted of her reviewing the type of outreach that the county had done in the past and determining how the county could improve on their public relations techniques. For example, Anewishki testified, she recommended that DPAC stop putting Stroger's face on fliers it distributed because he was very unpopular at the time.

¶ 33    Anewishki acknowledged that CGC was paid $24,975 for its work. She explained what that fee was for: "Strategic planning, public relations, media planning to buy, creative, because when you do a media buy, even though you pay for the cost of the ad, the agency also gets a commission, the reporting, personnel, postage, telephone, mileage, supplies." When asked how the figure of $24,975 was reached, Anewishki said that Mullins told her that the budget had to be under $25,000. She testified that, if she had performed the work she did for the county in the private sector, she would have likely charged somewhere around $50,000. Anewishki acknowledged that her work for the county consisted mostly of Internet research.

¶ 34    Christine Geovanis, a communications associate in DPAC, testified that, in April 2010, she was assigned to promote workshops and public gatherings that would spread awareness of the federal flood grants. She said that the flood grant promotion "was made an extreme priority in the department." She wrote several press releases as part of that assignment.

¶ 35    Geovanis said that, ordinarily, DPAC used county employees to distribute fliers, not outside contractors. She could only remember one instance in which an outside vendor had been used to do promotion for DPAC.

¶ 36    Geovanis testified that she never worked with CGC from December 2009 through March 2010, even though a CGC invoice for that period said that it worked with DPAC "to strategize and craft promotion." In fact, she did not work with anyone outside of DPAC in the spring of 2010.

¶ 37    Geovanis testified that she learned that CGC had taken credit for her work—her press releases and research—in April 2010. On cross-examination, she acknowledged that she

received this information from the county's inspector general and not from her personal knowledge.

¶ 38 The parties stipulated to Render's testimony. Render knew Mullins through professional contacts. In January 2010, Mullins approached Render and told him that the county had opportunities for people with backgrounds in communications, including an opportunity to provide "marketing outreach services to inform suburban residents of a federal flood relief grant." At the time that Mullins told Render about this opportunity, Render was unemployed.

¶ 39 Render prepared a proposal that he submitted to Mullins. The initial proposal listed the budget at $27,000, but Mullins lowered that number to $24,980. Mullins also made other changes to the draft. Render wound up submitting several drafts of the proposal to Mullins before he accepted it.

¶ 40 Render received a check from the county on February 25, 2010, for $24,980. At that time, he had performed no work on the contract. Render testified that he intended to perform the work pursuant to the contract but did not have the opportunity to do so.

¶ 41 On March 1, 2010, Render withdrew $11,360 in cash. He gave Mullins $9000 outside his apartment. Render said that Mullins had asked for the cash in order to pay other vendors. Render said that he never met defendant or President Stroger.

¶ 42 Render had agreed to testify after entering into a deferred prosecution agreement with the federal government.

¶ 43                                          2. Department of Energy Grant Contracts

¶ 44 The next group of contracts dealt with a federal Department of Energy grant.

¶ 45 On February 24, 2010, the same day that Ramos signed the justification letters for CGC and Render, a justification letter was also drafted for Arrei Management (Arrei). The letter said that Arrei would work with DPAC "to build awareness of the composting and electronic collection programs to help resident [*sic*], business [*sic*], and other local governments become more energy efficient and conscious of conservation initiatives" and with the department of environmental control to "effectively communicate the *** Composting and Electronic Collection grant program to the 2.5 million resident's [*sic*] of Cook County." The letter said that the department of environmental control had selected Arrei because of its "vast experience *** in areas related, but not limited to, strategic planning and its diverse background in general consumer and multicultural media." The letter was signed by Kevin Givens, the director of the department of environmental control.

¶ 46 On March 18, 2010, Givens signed a justification letter for Michael L. Peery. This letter said that Peery would provide the same services as Arrei, using exactly the same language as the Arrei justification letter. The letter said that Peery was selected as a sole-source vendor because of his "vast experience in areas related, but not limited to, strategic planning and his position as a radio and television producer."

¶ 47 On March 26, 2010, the county wrote checks to Arrei and Peery for $24,995 and $24,980, respectively. Defendant had established a bank account for Arrei in 2006. As of December 31, 2009, Arrei had $16.76 in its account. From that date until March 29, 2010, there were only two transactions relating to that account: a withdrawal of $10 and a service fee of $6.76. The Cook County check was deposited in Arrei's account on March 29, 2010.

¶ 48    On March 31, 2010, two transfers of $7000 and $4500 were made from Arrei's account to CGC's accounts. On April 2 and April 9, 2010, three additional transfers resulted in $1500 being transferred from Arrei to CGC. After a subsequent transfer of $10,000 to a checking account held by an individual named Shawn Thompson, Arrei's bank account had a balance of $173.

¶ 49    Givens testified that he was the director of the department of environmental control at the time the Arrei and Peery contracts were formed. Givens said that, in 2009, the department was selected to receive a $12,695,000 federal block grant "for energy"; in 2010, Givens was selected to manage the overall program. The grant money could only be used for specified purposes. Givens said that the grant could not be used for public relations or outreach.

¶ 50    In March 2010, Givens had a meeting with defendant and Mullins, where defendant asked Givens how the grant money could be used. Givens testified that defendant and Mullins brought up the idea of using the grant money for an outreach program, and Givens told them the grant money could not be used for that purpose. At trial, Givens testified that he double-checked that the grant money could not be used for public relations by calling the Department of Energy; he previously told investigators that he had not called the Department of Energy to double-check.

¶ 51    Givens said that, after his initial meeting with defendant and Mullins, Mullins had presented him with the justification letters for Arrei and Peery. Givens acknowledged signing both letters but expressed reservations about doing so. He said that he had drafted justification letters in the past and that the justification letters for Arrei and Peery were "not sufficient in terms of what [he] consider[ed] a justification letter to be" because they lacked sufficient detail about what Arrei and Peery would do. And the proposals that Arrei and Peery had submitted lacked the "very detailed information" that such proposals usually had about the cost of a contract. Givens said that both the Arrei and Peery proposals were simply "PowerPoint presentation[s]."

¶ 52    Givens asked Mullins why both Arrei and Peery would be needed to perform the same work for the department, and according to Givens, Mullins replied "that these contracts and this activity would help support the legacy of the department in terms of the work that the department had begun." Givens expressed his reservations about the letters to Mullins, and they had "a pretty heated back and forth." Givens testified that "most of the pressure [to sign the letters] came from Mr. Mullins."

¶ 53    Eventually, Givens signed the letters because of the "political pressure" he felt. He said that he felt nervous about losing his job if he did not sign the letters because he thought that the justification letters had Stroger's support and approval. He also thought that the public relations activities would be funded by the budget of the office of the president, not by the federal energy grant.

¶ 54    Anewishki testified that defendant, along with owning CGC, also owned Arrei "at one point." When defendant went to work for Cook County, Mark Carter became the owner. Arrei's bank records indicated that defendant remained listed on the company's bank accounts.

¶ 55    Anewishki testified that she developed Arrei's proposal for an outreach campaign, which was a PowerPoint presentation with less than 10 slides. Anewishki acknowledged that the proposal prepared for Arrei was essentially the same as the proposal prepared for CGC. When asked if Arrei did any work pursuant to the contract, Anewishki said, "I do not know. My purpose was only to do the initial research as well as the proposal."

¶ 56    The parties stipulated to Peery's testimony. Peery met Mullins in 2009 and the two became friends. In January or February 2010, Peery asked Mullins if Cook County had any "media projects" that he could work on. Mullins told Peery that there "were contracts coming up for a bid related to media outreach for an energy grant and that Peery should submit a proposal."

¶ 57    Peery drafted his proposal "based upon a template provided by Mullins." The amount listed in the proposal, $24,985, was an amount that Mullins suggested. Mullins told Peery that there "would be less red tape if the contract was for less than $25,000."

¶ 58    Peery said that, using the $24,985 he received from the county, he intended to purchase radio air time, newspaper advertisements, and use social media. But he did not complete an invoice bearing his name that was submitted to the county; the first time he saw it was when investigators showed it to him. Peery testified that the only work he did was attending two or three meetings at the Cook County building.

¶ 59    Peery testified that, on March 26, 2010, Mullins hand-delivered him a check for the full amount of the contract. When Mullins gave Peery the check, he told Peery that another, unnamed company would be hiring people to pass out fliers for the project and asked Peery for cash to pay this other company. Peery agreed to give Mullins the cash "because he was afraid to risk his relationship with Cook County in future contracts." Peery gave Mullins two $6000 cash payments on two separate occasions: once in the parking lot of an office supply store and again at a coffee shop a week later. Mullins told Peery not to tell anyone about the cash.

¶ 60    Peery had no interactions with defendant and did not know her. He agreed to testify pursuant to a deferred prosecution agreement with the federal government.

¶ 61    The final contracts relating to the federal Department of Energy grant were made with two companies called Alliance Media and Marketing (Alliance) and Urban Rapport, Inc. (Urban Rapport). Defendant signed the justification letters for both companies, which were dated April 1, 2010.

¶ 62    The justifications letters said that Alliance would work with DPAC "to build awareness of the [department of environmental control's] energy and conservation programs throughout the northern and western suburbs of Cook County" in order to "help Cook County residents, business [*sic*], and other local governments become more energy efficient, and cognizant of conservation initiatives." Urban Rapport would work with DPAC "to build awareness of the [department of environmental control's] energy and conservation programs throughout suburban Cook County."

¶ 63    According to the letters, Alliance would target " 'hard to reach' and lower income residents" and "develop and disseminate promotional and informational materials throughout key locations in Cook County." Urban Rapport would create a marketing plan to "effectively communicat[e] the Department of Environmental Control's Composting and Electronic Collection grant program to the 2.5 million resident's [*sic*] of Cook County" and "develop and disseminate promotional and informational materials throughout key locations in Cook County."

¶ 64    The letters indicated that Alliance was selected "based upon his [*sic*] vast experience in areas related, but not limited to communications and marketing." Urban Rapport was selected "based upon its vast experience in areas related, but not limited to, strategic planning and communications marketing."

¶ 65     The justification letters requested $24,950 for the Alliance contract and $24,975 for Urban Rapport, which would be funded out of the budget for the office of the president. On April 2, 2010, the county wrote checks to Alliance and Urban Rapport for the full amounts of their respective contracts.

¶ 66     Defendant signed the Alliance justification letter on behalf of the office of the president. Only individuals with "signature authority" from their department in the county could sign documents on behalf of the departments. On February 25, 2010, Stroger had given defendant authority to sign purchase requisitions on behalf of "all offices under the president." On March 3, 2010, Stroger authorized defendant to sign invoices for the comptroller's office for "all offices under the president."

¶ 67     Both Alliance and Urban Rapport were companies related to an individual named Terrell Harris, who was also known as Shorty Capone. We discuss Harris's involvement with the contracts further in a later subsection.

¶ 68                                   3. Census Contracts

¶ 69     The final group of contracts concerned a Cook County program designed to improve its residents' responses to the 2010 census. Defendant signed each justification letter for these contracts on behalf of the office of the president.

¶ 70     The first two justification letters were dated April 15, 2010, and related to two individuals named Clifford Borner and Kenneth Demos. The letters said that Borner and Demos would "immediately begin" an educational campaign regarding the census "by organizing 'door-to-door' participants throughout south suburban Cook County, and by participating in training and informational session [*sic*]." They both said that Borner and Demos would use "multi-media education and public service announcements" to "stress the severe loss of federal funds given to other states and municipalities with the loss of programs in Cook County that are of an everyday necessity within the southern suburbs." Both letters said that the president's office had selected Borner and Demos "based upon [their] keen business acumen and *** extensive involvement in community affairs." The letters requested $24,995 and $24,997 for Borner and Demos, respectively. The county wrote checks for those amounts to Borner and Demos on April 22, 2010.

¶ 71     The parties stipulated to both Borner's and Demos's testimonies. Borner testified that he owned a lawn care company that "also distribute[d] fliers and other materials." Mullins contacted Borner in March 2010 and asked him if he was available to distribute census materials for the county. Mullins indicated that Borner would be working with another company but did not specify the name of the other company.

¶ 72     Borner said that he did not draft a proposal for his contract with the county; Mullins drafted it while he was on the phone with Borner. Borner's wife signed the proposal for him after Mullins faxed it to them.

¶ 73     Borner received a check for $24,995 from the county on April 22, 2010, even though he had not performed any work pursuant to the contract. Borner deposited the check in his bank account and purchased a cashier's check for $12,497.50 payable to his wife. His wife deposited that cashier's check and withdrew $5000 in cash that she gave to Borner. Borner then gave Mullins the $5000 in cash, which Mullins said he needed to pay the other company working on the census project.

¶ 74    Borner said that, eventually, he did some work pursuant to the contract, "including distributing promotional material on approximately ten occasions with others." He also attended meetings at a county office building. Mullins ran those meetings and handed out prepared fliers. Borner never met defendant or talked to defendant about his proposal.

¶ 75    Demos had run a title insurance company from the mid-1980s until 2009, when it closed. He was looking for work in early 2010 and asked Mullins, whom he had known since 1983, for a job with Cook County.

¶ 76    Mullins did not offer Demos a job but told him that there was "an opportunity for a Cook County contract performing outreach services to increase the number of people responding to the national census." Mullins told Demos that the contract "had to be priced at less than $25,000." Demos said he wrote the first two pages of his three-page proposal for the contract but that someone else made changes to his draft, added a section labeled "Objective," and added the third page that listed the $24,997 contract price.

¶ 77    Demos testified that he never met defendant and never did any of the things listed in the justification letter signed by defendant. The only work he did pursuant to the contract "was to canvas parts of Cicero on three or four occasions for a total of ten hours." Demos said that, at the time he entered into the contract, he intended to perform his part of the bargain.

¶ 78    Around April 22, 2010, Mullins handed Demos a check for $24,997 at the Hard Rock Café where Demos was employed. Mullins told Demos that a subcontractor would be doing some of the work under the contract, so he asked for half of the check amount in order to pay the subcontractor. Demos refused to give Mullins half of the check because he would have to pay taxes on the full $24,997; he gave Mullins $8478 in cash instead.

¶ 79    Defendant also signed a justification letter on April 15, 2010, for a company called Griffin Media Group (Griffin Media). The letter indicated that the office of the president intended to "set up informational sessions for residents throughout Cook County to discuss why participating in the census is important to help Cook County increase response." It noted that Cook County's response rate was lower than the national and state averages and cited figures showing that federal programs distributed funds to local governments based on census data. The letter listed several demographic groups that, historically, had low response rates for the census and indicated that the campaign would be designed to target those groups with "educational training, informational sessions and 'door-to-door' education outreach."

¶ 80    But the justification letter for Griffin Media contained no information about Griffin Media itself and did not explain why Griffin Media needed to be exempt from the bidding process. Griffin Media's proposal was a seven-page PowerPoint presentation that discussed much of the same information as the justification letter.

¶ 81    Griffin Media submitted an invoice to Cook County dated April 16, 2010, for the full amount of the contract—$24,995. Cook County wrote Griffin Media a check on April 22, 2010.

¶ 82    Defendant also signed a justification letter for the Illinois Human Development Council (IHDC) on April 16, 2010. This letter largely used the same language as the letters for Borner and Demos. Specifically, the letter requested a $24,995 contract for IHDC to help with the census project by "by organizing 'door-to-door' participants throughout South Suburban Cook County, and by participating in training and informational session [*sic*]." The letter said that IHDC would use "multi-media education and public service announcements" to "stress the

severe loss of federal funds given to other states and municipalities with the loss of programs in Cook County that are of an everyday necessity within the southern suburbs." And the letter said that IHDC was qualified for the contract due to its "extensive involvement in local community affairs."

¶ 83    The parties stipulated to the testimony of Leonard Searcy, who ran IHDC. Searcy said he established IHDC in 2009 as a nonprofit corporation designed to perform social service work such as employment programs and antiviolence campaigns. In 2010, Searcy was focused on soliciting funding for the programs that he wanted IHDC to implement.

¶ 84    Searcy wrote a letter to Mullins about IHDC working for Cook County. He met with Mullins shortly thereafter, and Mullins said that he wanted IHDC to do census work. Searcy said that he did not prepare the proposal or any other documents for the county on IHDC's behalf; Mullins presented the documents to Searcy after they had already been prepared. Mullins, not Searcy, suggested the contract price of $24,995.

¶ 85    Searcy testified that Mullins told him that, if he did not want IHDC to do the work, Mullins could hire a subcontractor to do it for $5000. Searcy said that he "understood Mullins to be suggesting that if IHDC did not want to perform any actual census outreach work but still wanted to receive the contract, IHDC could pay a subcontractor $5000 from the $24,995 payment from the County, and keep the remaining $19,995 even though IHDC would not have done any work."

¶ 86    Searcy said he began to grow concerned about the contract with the county, so he contacted a member of Mullins's staff named Sean Howard. Searcy asked Howard if the subcontractor arrangement proposed by Mullins was typical, and Howard replied that "it was unusual and did not seem right." Searcy asked Howard to tell Mullins that IHDC was no longer interested in being involved with the census project.

¶ 87    Searcy said that, a few days later, he received a call from his accountant informing him that IHDC had received a check from Cook County for $24,995. Searcy called Mullins's office again and reiterated that he did not want to be involved. Searcy returned the check to the county.

¶ 88    Searcy said that he never issued any invoices, including an invoice that had been submitted to the county on IHDC's behalf, and never performed any work pursuant to the contract. He had never seen the justification letter signed by defendant until investigators showed it to him.

¶ 89    Searcy had met defendant during Stroger's last campaign and shortly after she had been appointed as his deputy chief of staff. Searcy said that he and defendant only spoke "in general" about contracting opportunities and IHDC's services. Searcy did not discuss the census project with defendant.

¶ 90    The final three contracts relating to the census outreach project were awarded to three companies: PR Everything A2Z, Citymerge, Inc. (Citymerge), and Mediarazzi International (Mediarazzi). The letters used the same language to describe the duties these companies would perform as the justification letters for Borner, Demos, and IHDC. And they said that these three companies were either qualified for the sole-source contract based on their "keen business acumen" or "extensive involvement in local community affairs."

¶ 91    The justification letters that defendant signed for these four companies were dated April 15, 2010, and April 16, 2010. Each of the proposals submitted by the companies were five-to-six-page PowerPoint presentations that recited similar statistics regarding response

rates to the census. Cook County wrote checks for $24,995 to each of the three companies on April 22, 2010.

¶ 92     Jaye Williams, the CFO of Cook County in 2010, testified that the county's budget for census research was $200,000. Initially, the $200,000 budget had been broken into two contracts, each for $100,000. Eventually, Williams noticed that the budget was reconfigured to involve eight contracts, each under $25,000. Williams was "not really" concerned by the fact that the contracts had been broken down. Williams testified that Mullins would have been responsible for approving the vendors for the census contracts.

¶ 93     Williams testified that, while she was at a conference in San Francisco in mid-April 2010, she got a call from her assistant, Cheri Jones. Jones told Williams that people were trying to get the census contracts signed, and Williams said she could not because she was out of town. Williams testified she later received calls from Joe Fratto, Stroger's chief of staff, and defendant, saying that "we were behind on the census work and we needed to expedite it as quickly as possible." Williams told Jones to sign off on the contracts for her. Williams did not know whether the vendors did any work before they were paid.

¶ 94     The parties stipulated to Jones's testimony, which corroborated Williams's testimony about the urgency defendant expressed regarding the census contracts while Williams was out of town. Jones also testified that she had never seen a situation where an invoice was approved and a check was issued on the same day.

¶ 95                    C. Terrell Harris, Also Known as Shorty Capone

¶ 96     Anewishki testified that CGC had previously done public relations work for a music producer named Terrell Harris, who also went by the name Shorty Capone. Specifically, CGC had been doing work for Urban Rapport, which was one of Harris's companies. Anewishki also testified that Griffin Media was "an associate" of Harris.

¶ 97     Anewishki testified that Harris contacted her and told her that Griffin Media was applying for a contract with Cook County. Harris asked Anewishki for a copy of one of the proposals she had created for either CGC or Arrei when it was applying for a contract with the county. Anewishki sent one of the proposals to Harris and reviewed the proposal that Harris had drafted.

¶ 98     Ramsen Isaac, an attorney who had represented Harris since 2006, testified regarding the formation of several companies related to Harris and various financial transactions involving those companies. Isaac used his Interest on Lawyers Trust Account (IOLTA) to perform financial transactions on Harris's behalf.

¶ 99     One company, Beatbangers, LLC (Beatbangers), was formed on June 15, 2007. Isaac was the registered agent of Beatbangers, and Harris was the sole manager of the company.

¶ 100     On July 15, 2009, at Harris's direction, Isaac wrote CGC two checks from his IOLTA totaling $15,000. Isaac did not know who owned CGC and had not met defendant.

¶ 101     On April 5, 2010, Isaac filed the articles of incorporation for Griffin Media. Isaac was listed as the registered agent, but Isaac testified that Zimbalist Griffin was the owner of Griffin Media. Isaac had met Griffin through Harris.

¶ 102     On the same day, Isaac deposited two checks from Cook County to Alliance and Urban Rapport, respectively, into his IOLTA, the client trust account he used for Harris. The checks totaled $49,925.

¶ 103 On April 7, 2010, Isaac, drawing on his IOLTA, wrote a check to Beatbangers for $43,925 and wrote a check to Harris for $6000 (a total of $49,925). The memo line for the Beatbangers check read, "Urban, Alliance."

¶ 104 On April 15, 2010, Isaac filed the articles of incorporation for Citymerge and Mediarazzi. Isaac was listed as the registered agent for both companies. Isaac testified that an individual named Prentiss Harris owned Citymerge and an individual named Malynda Norris owned Mediarazzi. Isaac had met Prentiss Harris and Norris through Harris.

¶ 105 On April 28, 2010, Isaac deposited the checks that Cook County had written to Citymerge, Griffin Media, and Mediarazzi, totaling $74,985, into his IOLTA. On April 30, 2010, Isaac wrote checks to Citymerge for $12,000, Mediarazzi for $5000, and Beatbangers for $14,995. On May 29, 2010, Isaac withdrew $5000 from his IOLTA. He could not recall whether this withdrawal was in cash or in a cashier's check, but the withdrawal slip had a line that read "If Purchasing a Cashier's Check Provide Payee Name," on which Isaac wrote "Beat Bangers LLC." On June 2, 2010, Isaac wrote Beatbangers another check for $4000 with a memo line reading "Citymerge." On June 28, 2010, Isaac wrote Prentiss Harris a check for $3985. Finally, on July 1, 2010, Isaac wrote checks to Zimbalist Griffin for $9985, Malynda Norris for $5000, Beatbangers for $3000, and Harris for $1000. The memo line for the July 1 check to Beatbangers read "Mediarazzi." The money paid out from Isaac's IOLTA from April 30 to July 1, 2010, totaled $63,965.

¶ 106 On April 30, 2010, a $5000 check from Beatbangers, dated April 28, 2010, was deposited into CGC's bank account. Anewishki testified that she did not recognize this check; she had never seen it before investigators showed it to her.

¶ 107 On July 6, 2010, Urban Rapport was incorporated. Harris was listed as the registered agent for the company. Cook County had written Urban Rapport a check for the full value of its contract on April 2, 2010.

¶ 108 The Illinois Secretary of State dissolved Griffin Media, Citymerge, and Mediarazzi on September 9, 2011, for failing to file an annual report or pay franchise taxes. And it dissolved Urban Rapport on December 9, 2011, for the same reasons.

¶ 109 D. Evidence of Contract Approval Process

¶ 110 Annette Goldsmith, Mullins's administrative assistant, testified that she began working on county contracts in January 2010. Goldsmith said that vendors would submit proposals to Mullins for contracts, he would sign off on them, and he would give them to Goldsmith in order for her to draft a justification letter. Once the department head signed the justification letter, Goldsmith would then submit the justification letter, the vendor's W-9 tax form, and a vendor request form to the comptroller's office. After the comptroller's office completed a purchase requisition form, Goldsmith would get a purchasing order signed by the office of the purchasing agent. She would then submit these documents for signatures by the department head, chief of staff, comptroller, and CFO. Once the purchasing order had been signed, the vendor could begin working.

¶ 111 Vendors would submit invoices for the work they had performed under the contracts. Goldsmith testified that, when she received an invoice, she would complete a 29A form, which would describe the work performed by the vendor. She would submit the 29A to the comptroller's office so that the comptroller's office could write a check to the vendor.

Goldsmith said that she would either mail the check to the vendor once it was written, or Mullins would ask for the check himself. Goldsmith estimated that the process of getting a check to a vendor usually took about two to three weeks.

¶ 112      Goldsmith testified that, after defendant began working at the county, "the time it would take to process checks changed dramatically." Goldsmith noted that vendors began to receive checks within 24 hours of submitting an invoice and that they also began to receive checks before they had completed any work. Goldsmith admitted that she did not know whether vendors were supposed to perform work before they were paid.

¶ 113      Goldsmith testified that she prepared the justification letters for CGC and Arrei. She recalled a meeting she had with Mullins and defendant where they told her they "wanted a check [for CGC] immediately." Goldsmith did not know anything about the scope of defendant's authority or her responsibility for processing checks.

¶ 114      Faisal Abbasi, who worked for Cook County from 2002 to 2010, testified that he began as the director of financial reporting in the comptroller's office in 2008. In that position, he was responsible for reviewing grant payments, 29A forms, purchase orders, and vendor invoices.

¶ 115      Soon after defendant took office as deputy chief of staff, she approached Abbasi and asked him general questions about the contracting process, including how vendors got paid. Defendant explained that she wanted to know because the board of commissioners did not like Stroger, which meant that Stroger could not "get stuff done" through the board. Abbasi told defendant that contracts under $25,000 did not need to get approved by the board and that sole-source vendors were not subject to the bidding process. He also showed defendant how to write a justification letter for a sole-source vendor. Defendant told Abbasi that the process seemed long and asked for Abbasi's help in getting through it.

¶ 116      A few days later, Abbasi met defendant at her office, and she gave him the packages for CGC and Render. She asked him to expedite the process for approving those two contracts because the grant program in the department of environmental control "was having issues for some time and it was one of the priorities to get it back on track." She said that she wanted the checks for CGC and Render "immediately."

¶ 117      Abbasi brought the documents for the purchasing department for signatures. He also helped defendant complete the 29A forms—the forms used to authorize the issuance of a check to a vendor.

¶ 118      Abbasi testified that he received checks for CGC and Render the same day that defendant had given the justification letters to him. He delivered those checks to defendant.

¶ 119      Abbasi followed the same expedited process for the Peery and Arrei contracts. He also delivered the checks for those vendors to defendant.

¶ 120      The parties stipulated to the testimony of Constance Kravitz, who was the comptroller of Cook County during the relevant period. Her responsibility was to oversee the county's finances, including all budgetary appropriations, expenditures, encumbrances, and revenues. She said that it was "not the policy of the Comptrollers' [*sic*] office to prepay vendors in advance of the performance of service or delivery of goods for expenditures under $25,000.00."

¶ 121      As the comptroller, Kravitz was Abbasi's supervisor. But, according to Kravitz, she "felt as if she [was] unable to monitor his activity, work product or correct his performance because he

is a Grade 24, a Shakman-exempt employee."[1] Kravitz said that, in February 2010, Abbasi told her that defendant "intended to do a sweep of the offices." Kravitz said she felt threatened by this comment.

¶ 122　　Kravitz also testified that Abbasi "spent a fair amount of time in [defendant's] office." She said that she learned that defendant and Abbasi had "circumvented the normal process of submitting requests for payment and issuing checks to vendors" in order to get checks for CGC and Render immediately. Kravitz acknowledged that she signed the purchase requisitions and 29A forms for many of the vendors involved in this case.

¶ 123　　Carmen Triche-Colvin served as the purchasing agent in the office of the purchasing agent from 1990 until January 2011. Triche-Colvin estimated that, at the beginning of 2010, three percent of all county contracts were both sole-source contracts and under $25,000. Around March 2010, Triche-Colvin noticed a "marked increase" in the number of contracts under $25,000 being formed. While she acknowledged that the county entered into hundreds of contracts for less than $25,000 per year, she found it unusual that so many sole-source contracts under $25,000 were being processed.

¶ 124　　Triche-Colvin noticed other unusual aspects about the contracting process in 2010. She noticed that the justification letters for the CGC and Arrei contracts were written on letterhead from the office of the president, which she said was "highly unusual" because she would have expected them to be on the letterhead of the department heads requesting the sole-source contracts (*i.e.*, Ramos and Givens).

¶ 125　　Triche-Colvin said that contract packages usually took about 7 to 10 business days to process. But she noticed that, in 2010, Abbasi had begun to personally bring down some contracts for her signature, which she also found unusual. When she asked Abbasi why he was bringing down the contracts himself, he replied that "[h]e was directed to by the Office of the President."

¶ 126　　Triche-Colvin also testified that it was "very unusual" for a deputy chief of staff to have signature authority for every office under the president as defendant did. She said that she had "never seen that before."

¶ 127　　Triche-Colvin testified that, as the purchasing agent, she did not examine the qualifications of vendors given sole-source contracts. Instead, she relied "on the expertise of the department to provide [her] with vendors who can provide those services." Triche-Colvin remembered sending back a few justifications letters for having insufficient detail but said that she signed off on them when the detail was added.

¶ 128　　The parties stipulated to the testimony of Tanya Sitkovski, an accounts payable coordinator with the county in 2010, who was responsible for approving payments and obtaining checks for county vendors. She testified that, for the contracts at issue, Abbasi told her that he needed

---

[1]The term "Shakman" refers to the consent judgments reached in *Shakman v. Democratic Organization*, No. 69 C 2145 (N.D. Ill. May 5, 1972) (consent judgment), which prohibited Cook County from making employment decisions for political reasons. See Cook County Government, Shakman Information/Employment Plan, https://www.cookcountyil.gov/service/shakman-compliance-office (last visited Dec. 2, 2016). A *Shakman*-exempt position "is one that involves policy making to an extent or is confidential in such a way that political affiliation is an appropriate consideration for the effective performance of the job." Cook County Government, Exempt Positions, https://www.cookcountyil.gov/service/exempt-positions (last visited Dec. 2, 2016).

checks immediately. She never spoke to defendant or Mullins about the contracts.

¶ 129                                    E. Evidence of Investigation

¶ 130    Patrick Blanchard, Cook County's inspector general since 2008, testified that he began to investigate defendant after a television news report indicated that CGC had a contract with the county and that defendant owned CGC. He began to view his investigation as a criminal investigation when he learned that Arrei had also received a contract.

¶ 131    Blanchard testified that "the law *** requires the justification why a no bid contract is justified in this case in that typically a no bid contract may be entered into if there is only one contractor in the world or two contractors in the world." He testified that there was "nothing" unique about CGC or Arrei that would justify a sole-source contract, "nor was there nothing [*sic*] unique about the proposed work." He said that the justification letters for the companies, which referred to the companies' "vast experience" were "glaringly false." He testified that this was particularly the case for Arrei, as it "was a company that had done no business for at least two years prior to our investigation extending back to January 1st of 2009, and during the course of our investigation it became very clear to me that Arrei was not capable of doing anything unique at all."

¶ 132    Blanchard also testified that he uncovered no evidence of any work performed by CGC or Arrei under their contracts. He did not consider the work of drafting a proposal "as being work performed." He acknowledged receiving the research that Anewishki had testified to but said that it "appeared to be just general research on general PR topics that could be easily generated in a computer search."

¶ 133    Blanchard similarly testified that Peery and Borner performed "no substantive work" pursuant to their contracts and that "the work itself also was not the type of work that should ever justify a sole source, that the work itself [was] so basic."

¶ 134    Blanchard also testified that there was nothing unique about any of the other vendors involved in this case, and he did not find any evidence of any work performed by them.

¶ 135    On cross-examination, defense counsel asked Blanchard whether he or anyone in his office had any experience in media or public relations work, and he replied, "No, other than we're all, you know, 50 years old and professionals." When defense counsel asked whether other individuals in the county other than defendant had responsibility for signing off on these contracts, Blanchard testified:

> "[D]uring the course of our investigation it became clear that Ms. Oglesby is not only the deputy chief of staff but she's a very strong person, and she had the ability and she exercised that ability to ensure that documents were signed so as to shorten the process for cutting checks."

But, he acknowledged, Triche-Colvin and others could have stopped a contract from being approved.

¶ 136                            F. Closing Arguments and Trial Court's Findings

¶ 137    The State argued that defendant and Mullins conspired to promote "a fraudulent vendor scheme." Defense counsel argued that the State presented no evidence of any agreement between defendant and Mullins, that the State could not prove that defendant exercised unauthorized control over the county funds because they had been approved by county

officials, and that most of the vendors testified that they intended to perform work pursuant to the contracts.

¶ 138    The court began its findings by noting that it was "eye popping," "disheartening," and "shocking" to hear "about this panic to take money that the federal government made available for one purpose and make sure that it gets spent, no matter what, in the manner in which has been described at this trial."

¶ 139    The court found that, soon after defendant started working at the county, she was given broad signature authority and numerous contracts under $25,000 began to be signed. The court noted that these contracts avoided "a full vetting and a hearing" before the county board. The court also found that defendant "sought out information and put pressure on people to get checks cut almost immediately, before any work was done."

¶ 140    The court found that the cash payments that some of the vendors made to Mullins were "obvious kickbacks." It also found that "[s]ome of the money in convoluted fashions went to companies under the sole control of [defendant], particularly the Arrei company and the CGC company."

¶ 141    The court acquitted defendant of the organizing and continuing financial crimes charges (counts I, II, V, and VI) on the basis that the State had not proved the existence of an agreement between her and the other alleged members of the conspiracy. The court said:

"I don't know that all of them were looking to get all the money for no work whatsoever; perhaps, very little work, and having some easy money and appeared to be a little naïve and some of them had never worked for the County before, and weren't sure about how things worked, may have been a little surprised by this.

But I don't know that there was an actual total meeting of the minds between [defendant] and all these other people, as far as they were all scheming together to steal. I think that may have been an end result, but it wasn't necessarily something that was planned together."

¶ 142    The court also acquitted defendant of the official misconduct charges (counts VIII through XIV), finding that the State had not proved that defendant knew that she was violating the various ordinances she had been charged with violating. See 720 ILCS 5/33-3(b) (West 2010) (individual commits official misconduct when he "[k]nowingly performs an act which he knows he is forbidden by law to perform").

¶ 143    The court found defendant guilty of theft (count III) and theft by deception (count IV). With respect to the two theft counts, the court stated:

"I find that these *** contracts were concocted as a fraud. There was never an intention to legitimately use County taxpayer money and put to any kind of good use; but rather, this was a scheme and a fraud and a premeditated course of conduct to extract money, some of it going back directly to Ms. Oglesby and some of it going to other people, but all of it was being executed with her help and participation, with Gene Mullins and these justification letters which she signed and which she was pressuring people like Mr. Givens and Mr. Ramos to participate in."

The court also found that the total amount of money taken from the county was "over $300,000, close to $325,000."

¶ 144    The court found defendant guilty of money laundering (count VII), saying, "The manner in which the funds were gone from bank to bank, and place to place, and money going through

this Shorty Capone/Terrell Harris and some coming back to her own company, this is exactly what money laundering is about."

¶ 145    Finally, the court found defendant guilty of unlawful bid stringing (count XV), stating, "Dividing up these contracts to get them under the radar of the County Board to—in amounts under $25,000 has indeed been proven beyond a reasonable doubt."

¶ 146                    G. Posttrial Proceedings

¶ 147    Defendant filed a motion for new trial. Defense counsel argued that, in order to prove the theft charges, the State was required to prove that defendant "knew or intended that the work on the vendor contracts would not be performed." Counsel pointed out that some of the vendors said they intended to do the work.

¶ 148    Defense counsel also noted that most of the conduct in setting up the contracts was performed by Mullins, not defendant. The court noted that defendant could have been held accountable for Mullins's conduct, and defense counsel replied that, to be accountable, "she would have to be working with him," but the State presented no evidence of defendant and Mullins working together on the contracts.

¶ 149    Ultimately, while acknowledging that defendant had a conflict of interest when she steered the contracts to CGC and Arrei, defense counsel argued that the mere existence of a conflict of interest was not tantamount to theft.

¶ 150    Defense counsel also argued that Blanchard's testimony was inadmissible because it was largely "incredible hearsay and unsupported speculation and opinion testimony that was relied on by the State in their [*sic*] closing argument."

¶ 151    The court rejected the notion that defendant was not involved in the contracting process, noting that she was "named on many of these justification letters to say that we have to get these contracts done." And the court did not find Anewishki "to be particularly credible" regarding the work that CGC and Arrei allegedly performed under the contracts. Rather, the court found that "[t]he work *** was really nothing more than applying for these contracts and getting money." The court also noted that all of the justification letters were nearly identical and that "this rushing and urgency to get the money paid immediately [was] further evidence of what was actually going on."

¶ 152    With respect to the argument that the State had to prove that defendant knew the work would not be completed, the court said:

> "I don't think she cared one way or the other whether the work was done. Even if some work was done, she was interested in the money that was being distributed. It wasn't about the work. And in most cases little or no work [was] done at all."

¶ 153    The court also rejected the notion that Blanchard's testimony should have been excluded. The court described his testimony as "the bridge between the county's own investigation and law enforcement" because "he explained how the matter got from matters happening within the county to law enforcement's attention." The court "assure[d]" defense counsel that he did not consider any of the things people said to Blanchard for the truth of the matter asserted in those statements; the court simply considered them for "why he kept doing what he kept doing and he kept investigating further in finding out more information."

¶ 154    The court sentenced defendant to 78 months' imprisonment on both theft counts, 60 months' imprisonment on the money laundering count, and 36 months' imprisonment on the

unlawful bid stringing count. Defendant filed this appeal.

¶ 155                    II. ANALYSIS

¶ 156           A. Sufficiency of Evidence of Theft

¶ 157     Defendant raises several challenges to the sufficiency of the State's evidence as to counts III and IV, which alleged that defendant committed theft (720 ILCS 5/16-1(a)(1) (West 2010)) and theft by deception (720 ILCS 5/16-1(a)(2) (West 2010)), respectively.[2]

¶ 158     Defendant contends that the State failed to prove her guilty of either offense beyond a reasonable doubt for five reasons: (1) it failed to prove that she had the requisite intent for either offense; (2) it failed to prove that she stole over $100,000 of the county's property, which elevated her theft convictions to Class X offenses; (3) it failed to prove that she deceived anyone in order to prove her guilty of theft by deception; (4) it failed to prove that she committed either offense "with at least three others," as the State alleged in the indictment; and (5) it failed to prove that she obtained unauthorized control over the county's property for purposes of the theft conviction.

¶ 159     When reviewing the sufficiency of the State's evidence, we determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). We will not substitute our judgment for that of the trier of fact with regard to the credibility of witnesses, the weight to be given to each witness's testimony, or the reasonable inferences to be drawn from the evidence. *Id.* A defendant's conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 160     As is clear from the abundant evidence detailed above, there were many vendor contracts at issue in this case, and defendant had varying degrees of involvement with each one. Thus, before we delve into the individual arguments concerning the sufficiency of the evidence, a brief summary of the State's evidence concerning defendant's involvement in each of the vendor contracts is helpful:

> 1. *The CGC Contract*: Defendant owned the company, instructed Abbasi to expedite payment to CGC, and received the check to CGC from Abbasi. The money paid to CGC went into accounts controlled by defendant.

> 2. *The Arrei Contract*: Defendant owned the company, she personally received the check to Arrei from Abbasi, and the money paid to Arrei was put into an account controlled by defendant. Defendant and Mullins also proposed using the energy grant funds for outreach, which is what Arrei ultimately contracted to perform.

> 3. *The Render Contract*: Defendant instructed Abbasi to expedite payment to Render and received the check for Render from Abbasi.

---

[2]Actually, both counts III and IV alleged that defendant committed the offense of theft, as subsection 16-1(a) of the Criminal Code of 1961 (720 ILCS 5/16-1(a) (West 2010)) defines all of its subsections as "theft." Subsection 16-1(a)(1) (720 ILCS 5/16-1(a)(1) (West 2010)) provides that a defendant commits theft when she obtains or exerts unauthorized control over the property of another; subsection 16-1(a)(2) (720 ILCS 5/16-1(a)(2) (West 2010)) provides that a defendant commits theft when she obtains *by deception* control over the property of another. For clarity's sake, we refer to the offense in subsection 16-1(a)(1) as theft and the offense in subsection 16-1(a)(2) as theft by deception.

4. *The Peery Contract*: Defendant and Mullins proposed using grant funds to pay for outreach programs like the one for which Peery received a contract. Defendant personally received the check for Peery from Abbasi.

5. *The Borner Contract*: Defendant signed the justification letter. Defendant also called Jaye Williams, Cook County CFO, to get the contract expedited.

6. *The Demos Contract*: Defendant signed the justification letter. Defendant also called Jaye Williams, Cook County CFO, to get the contract expedited.

7. *The IHDC Contract*: Defendant signed the justification letter. Defendant also called Jaye Williams, Cook County CFO, to get the contract expedited.

8. *Contracts with Companies Related to Terrell Harris (Alliance, Urban Rapport, Griffin Media, Citymerge, Mediarazzi)*: Defendant had a prior relationship with Harris, for whom she had performed public relations work. Anewishki, working for CGC, sent Harris a template for the contract proposals she had used for Arrei and CGC because Harris was going to apply for a contract. Defendant signed the justification letters for each of these companies. Shortly thereafter, on April 30, 2010, another of Harris's companies, Beatbangers, paid CGC $5000, a check that Anewishki testified she did not recognize and had never seen before it was shown to her by investigators.

¶ 161    We now turn to the individual arguments raised by defendant concerning the sufficiency of the evidence.

¶ 162                    1. Intent to Permanently Deprive County of Use or Benefit of Money

¶ 163    Defendant was convicted of theft and theft by deception. A person commits theft when she knowingly "[o]btains or exerts unauthorized control over property of the owner." 720 ILCS 5/16-1(a)(1) (West 2010). A person commits theft by deception when she "obtains by deception control over property of the owner." 720 ILCS 5/16-1(a)(2) (West 2010). In addition, relevant to this case, for each of these theft offenses, the State must prove that the defendant "intends to deprive the owner permanently of the use or benefit of the property." 720 ILCS 5/16-1(a)(1)(A), (a)(2)(A) (West 2010). It is proof of this latter element, regarding permanent deprivation of the use or benefit of the property, that defendant first challenges. We should begin by discussing what this language means, as the offense of theft covers many different scenarios.

¶ 164    The "theft" charged in this case does not involve the stealing of a piece of tangible property like a diamond necklace or a painting but rather concerns a "situation[ ] in which a defendant contracts with a person to perform services or deliver goods. The defendant then accepts money, but does not perform the contract." *People v. Riner*, 234 Ill. App. 3d 733, 736 (1992). By receiving the owner's money but failing to render the agreed-upon performance, the contractor has deprived the owner of the use or benefit of that money. *Id.*

¶ 165    Relying on this principle, defendant argues that the State failed to prove that she intended that the vendors would not perform the contracted services in exchange for the county money they received.

¶ 166    Direct evidence of such intent is rarely available. *People v. Rolston*, 113 Ill. App. 3d 727, 731 (1983). Evidence of a defendant's intent may be inferred from the facts and circumstances surrounding the alleged theft, including the act of the theft itself. *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 31.

¶ 167    Defendant notes that nine of the vendors testified that they intended to perform services pursuant to the contracts and that Mullins was the one who arranged the contracts, not defendant. Defendant contends that, while there may have been a breach of contract between the vendors and the county, a breach of contract does not show any intent to permanently deprive the county of the use or benefit of its money.

¶ 168    It is true that "[a] defendant's failure to fulfill a contract is not proof of a specific intent to defraud." *Rolston*, 113 Ill. App. 3d at 732. Thus, "[w]here the defendant's actions between the time of the contract and the arrest manifest an intention to perform the contract, a conviction for theft *** should not stand." *Riner*, 234 Ill. App. 3d at 736. But the mere assertion that the defendant has "not gotten around to performing the contract will not negate the intent to permanently deprive." *Id.* at 737.

¶ 169    Viewing the evidence in the light most favorable to the State, we find sufficient evidence to demonstrate that defendant intended that the vendors would not perform the contracts at issue. As discussed more fully below, the evidence showed that (1) defendant's own companies, which received two of the contracts, either did not perform the contract at all or performed such negligible work as to amount to nothing more than a token pretense of performance; (2) other vendors similarly performed either no work or negligible work; (3) defendant prepaid the vendors for their work, contrary to established protocol, leading to the permissible inference that they were never expected to actually perform; (4) many of the companies receiving these sole-source contracts for their supposedly unique, specialized services had only just formed as companies or otherwise had nothing in terms of credentials that indicated their suitability for a no-bid contract, again leading to the permissible inference that they were never expected to actually perform the work; (5) defendant personally profited from many of the contracts, either because the county money went to her own companies or because she received a kickback from the vendors, suggesting that defendant's true concern was personal enrichment and not performance of the work; and (6) defendant's drafting of justification letters for these contracts as sole-source contracts, as well as the valuing of the contract amounts at just under $25,000 to avoid county board scrutiny of the contracts, could lead a rational finder of fact to infer guilty knowledge on defendant's part, as she went to great lengths to avoid any public scrutiny of these contracts.

¶ 170    The evidence at trial showed that defendant facilitated the formation of the contracts with private vendors, two of which belonged to her. Defendant signed justification letters for some of these vendors that reiterated the same generic descriptions of the work the vendors were being hired to perform, as well as the same vague descriptions of the companies' qualifications as sole-source vendors.

¶ 171    Several of the companies appeared to be fronts designed solely to obtain money from the county. Griffin Media was incorporated on the same day defendant had signed off on the justification letter and 29A form for that company. Citymerge and Mediarazzi were incorporated on April 15, 2010, one day before defendant signed off on justification letters extolling their "extensive involvement in local community affairs." Urban Rapport was not even in existence when defendant signed off on paying it for its allegedly "vast experience in *** strategic planning and communications marketing"; the company would not be incorporated until more than three months later. And each of Griffin Media, Citymerge, Mediarazzi, and Urban Rapport would be dissolved less than two years after they were created. Moreover, most of the money that these companies received was transferred to other

companies or individuals, including Harris and his company Beatbangers. The fact that these entities essentially operated as shell companies, despite defendant approving letters praising their experience, further supports the notion that defendant did not actually intend to find legitimate vendors who would actually perform the work that they were supposed to perform.

¶ 172        Likewise, Arrei was a barely existent company. Before receiving the Cook County check, Arrei had less than $20 in its bank account for several months. And after the check was deposited in Arrei's account, it was soon depleted again, mostly by transfers of money from Arrei to CGC. Anewishki testified that she was not sure whether Arrei even had an office, even though she had completed the contract proposal on Arrei's behalf.

¶ 173        Similarly, IHDC, while appearing to be a legitimate nonprofit corporation, had only been established in 2009, a year before it was awarded a sole-source contract based on its "extensive involvement in community affairs." In actuality, according to its founder Leonard Searcy, IHDC had done almost nothing except to seek funding for its operations. Other vendors had limited or no experience in public relations or government media campaigns. For example, Borner ran a lawn care business, and Demos ran a title company.

¶ 174        The fact that none of the companies actually had the experience that was described in the justification letters shows that defendant misrepresented their capabilities to the county. A reasonable trier of fact could conclude that, by making such misrepresentations, defendant simply wanted to form contracts from which she or Mullins could receive kickbacks—not that she intended to form legitimate contracts that would result in the performance of legitimate work.

¶ 175        Furthermore, defendant received compensation from several of the contracts. Obviously, the CGC and Arrei contracts directly benefited defendant, as their checks were immediately deposited into accounts that defendant controlled. And the money given to Arrei was transferred to CGC, directly enriching defendant's company. Moreover, Beatbangers, a company related to Terrell Harris, paid CGC $5000 soon after numerous other companies established by Harris had received contracts through the county. Anewishki testified that she had never seen that $5000 check before, even though she had allegedly been tasked with running CGC—including its billings—while defendant worked for the county. It was not unreasonable for the court to conclude that the $5000 check was a kickback that defendant received in exchange for giving contracts to Harris's various corporate entities. The fact that defendant personally benefitted from these contracts further shows that defendant did not intend to steer contracts to these vendors so that they would perform the work, but rather that she did so to enrich herself.

¶ 176        It is true that Anewishki testified that she performed CGC's contract by conducting research, performing a communications audit, and planning out the county's marketing campaign for the flood grant. But the trial court found that she was not credible. And the trial court had the research performed by Anewishki available to view. Reviewing the record, including the research Anewishki performed, it was not unreasonable for the trial court to conclude that the work she had done was simply an attempt to cover defendant's tracks. The research included in the record largely consists of printed-off copies of newspaper articles or promotional materials CGC had received from the county. Other than the brief, generic PowerPoint proposals submitted to the county for the contract, the record shows no original content created by Anewishki as part of the CGC-Cook County contract.

¶ 177      And with respect to Arrei, defendant's other company, Anewishki admitted that the only work she did was to prepare a proposal. The trial court could reasonably conclude that any work done by Anewishki was simply an attempt to create some minimal evidence of work rather than an actual attempt to perform the contract.

¶ 178      Importantly, the work that Anewishki claimed to have done for CGC fell far short of the work described in the CGC justification letter, which asked for $24,975. That letter said that CGC would work with DPAC "in the strategic implementation of media tactics designed to inform residents of suburban Cook County of a grant that is available for those affected by the floods of 2008." Yet according to Anewishki, she did not implement any specific tactics with DPAC; she simply provided Mullins with initial information about the floods and about certain media outlets. No plan was ever developed.

¶ 179      Similarly, CGC's proposal for the $24,975 contract said that its responsibilities would include the development of a "detailed strategic outreach plan and timeline," the "[e]xploration and outreach to target media and audiences," the scheduling of "media opportunities for county staff to talk about the success of the program," the distribution of "monthly press releases," the drafting of "program materials" to distribute at unspecified "targeted locations and events," the development of benchmarks to measure the success of the program, the creation of monthly progress reports, and "[o]ngoing consultation." Yet Anewishki admitted that she did some initial research and drafted a proposal, saying that work was sufficient to justify the full $24,975 price. Given the gulf between the amount of work outlined in CGC's proposal and the amount of work Anewishki said she did to complete the contract, we reject defendant's claim that the State failed to prove that CGC did not perform the contract.

¶ 180      With respect to the other vendors, most did nothing to perform on the contracts. Certainly, none did anything approaching the amount of work described in the justification letters that defendant signed or in the proposals that the vendors submitted to the county.

¶ 181      While a few attended meetings or, in Borner's case, distributed promotional materials 10 times, this court has held that "a token pretense at performing the contract is insufficient to overturn a *** finding [that] the defendant intended to permanently deprive the owner of the use and benefit of the money." *Riner*, 234 Ill. App. 3d at 737; see also *People v. McManus*, 197 Ill. App. 3d 1085 (1990); *People v. Wheadon*, 190 Ill. App. 3d 735 (1989).

¶ 182      For example, in *Wheadon*, 190 Ill. App. 3d at 736, the defendant was an attorney for a township park district board whose company was hired by the board to solicit bids and enter into contracts to rehabilitate one of the district's buildings. The board gave the defendant a $5000 check to find and supervise the subcontractors, but the defendant deposited the check in his own bank account. *Id.* at 736-38. The defendant advertised the availability of contracts in the newspaper and met with two general contractors, who gave him estimates on the work they would perform. *Id.* at 737. The defendant took no action on the estimates for 2½ years. *Id.* at 739.

¶ 183      The court concluded that the defendant possessed the intent to permanently deprive the board of the use and benefit of its money when he immediately deposited its funds in his own account, despite his "token pretense of fulfilling the contract." *Id.* at 740. The court noted that the funds were for the repair work on the building, not a fee for the defendant's services, but the defendant immediately deposited the check in his bank account. *Id.* at 739. And the court highlighted the fact that the defendant had done very little to complete the contract, despite taking the full amount allocated for the project by the board. *Id.* at 739-40.

¶ 184	Similarly, in this case, any steps taken to complete the contracts appeared to be token pretenses of fulfilling the county contracts. Most of the vendors performed no work, and those that did completed simple tasks. The trial court could reasonably conclude that the work performed by the vendors was insufficient to negate the evidence that defendant intended to permanently deprive the county of the use and benefit of its funds.

¶ 185	Moreover, the State presented circumstantial evidence that tended to show defendant's guilty knowledge. Each contract was for a price just a hair below $25,000, the threshold amount requiring approval by the Cook County board of commissioners. And each of these contracts were sole-source, meaning they would not be subjected to a competitive bidding process. While defendant claims that there was no evidence that she made these decisions about the structure of the contracts, Abbasi testified that defendant asked him about ways to circumvent the board because it did not like Stroger. And he explained to her that single-source contracts under $25,000 would not be submitted to the board. The fact that each of these contracts were sole-source contracts, valued at just under $25,000, supports an inference that defendant recognized the illegitimacy of these contracts and tried to shield them from outside scrutiny and procedural safeguards.

¶ 186	Last, but by no means least, the timing of payment to the vendors provided critical support to the State's case. The evidence showed that defendant expedited the process for getting the vendors paid as soon as possible. According to several of the State's witnesses, vendors working for the county usually received checks at least several days after submitting invoices, and vendors were not paid until they had actually performed the work they were hired to do and submitted invoices. But in the case of these contracts, defendant, through Abbasi, ensured that checks were paid out almost immediately upon the contracts being approved—and before any work had been performed. The unusual urgency with which the money was paid out to these vendors, and still more importantly the fact that the vendors were paid before they performed any work whatsoever, could lead a rational trier of fact to conclude that the vendors were never expected to perform the work in the first place.

¶ 187	Defendant has answers to all of the State's evidence, but as we explain below, we find them to be unavailing.

¶ 188	Defendant cites *Rolston*, 113 Ill. App. 3d 727, to support her argument that the State's evidence proved nothing more than a breach of contract. In *Rolston*, three homeowners ordered windows from the defendant and paid him, but the defendant did not order the windows from the dealer. *Id.* at 728-30. But the defendant explained that he had not yet ordered the windows because he was waiting for 100 windows to be ordered; if he ordered more than 100 from the dealer, he would not have to pay for shipping costs. *Id.* at 729-30. Here, unlike *Rolston*, there was no reasonable explanation for the surreptitious, expedited contracting process in which defendant engaged, let alone for her personally benefitting from contracts issued to unqualified or nonexistent companies.

¶ 189	Defendant also contends that there was a reasonable explanation for the vendors failing to perform under the contracts because "media coverage and the active criminal investigations intervened." But none of the vendors said that they did not perform because of media scrutiny or the investigation. To the contrary, the evidence showed that most did nothing because nothing was expected of them. And defendant fails to explain how increased scrutiny of the contracts would mean that *less* work would be done. If anything, scrutiny would have compelled the vendors to do the work they were supposed to do—thereby justifying the

contracts—if, in fact, the contracts were legitimate. In any event, even if defendant's take on the evidence here were a permissible one, the trial court was not required to accept it. See *Siguenza-Brito*, 235 Ill. 2d at 229 ("[T]he trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt.").

¶ 190    Defendant also argues that her signature on various documents necessary for approval of the contracts proved nothing because "the evidence established that these documents were generated by and under the direction of Eugene Mullins." It is true that Goldsmith testified that Mullins directed her to draft several of the justification letters. But defendant ignores the other evidence showing her intent: signing justification letters for numerous unqualified and even nonexistent vendors, receiving county funds via checks made out to her own companies, asking Abbasi how to circumvent the board, enlisting Abbasi to help her expedite the contracts, suggesting to Givens that the energy grant money be used for outreach (and then ignoring his response that it could *not* be used for that purpose), and receiving money from one of Harris's companies after signing justification letters and 29A forms for other companies belonging to him. Viewing the evidence in the light most favorable to the State, we cannot say that it proved Mullins's intent alone without proving defendant's involvement as well.[3]

¶ 191    Finally, defendant argues that her efforts at expediting the rate at which vendors were paid and eluding board scrutiny could simply reflect "a concern that the County Board would not approve or would delay these projects for political reasons, not a concern that there was anything wrong with the contracts themselves." Defendant would have us view the fact that each of the contracts was just under $25,000 in isolation. But the fact that the contracts were under $25,000 was just one piece of evidence tending to show her intent, along with the fact that her company personally benefitted from the contracts, that she steered contracts to shell companies owned by one of her business associates, that few of the vendors did any work whatsoever, and that she pushed to ensure that the vendors were paid immediately upon their being awarded contracts. In any event, the reason for the expedited contracting process was a question of fact left to the trial court to resolve. The trial court's interpretation of the evidence was by no means unreasonable.

¶ 192    We recognize that this was a circumstantial case, but most cases of this nature are. People rarely advertise their criminal intent. Defendant could pick apart various pieces of evidence and, viewing them in isolation, argue that they prove nothing. It is true that designating a contract as a sole-source contract or valuing a contract at just below $25,000 are not, in and of themselves, crimes (though structuring contracts to avoid competitive bidding procedures is, as discussed below). It is apparently true that the prepayment of vendors is not illegal, even if it is a departure from the normal practice. And it is always within the realm of theoretical possibility that the vendors eventually would have performed these contracts but simply did not have the chance to do so before the government began its investigation.

¶ 193    But the able and experienced trial judge considered all of the evidence and made a common-sense appraisal of how the pieces fit. Taken together, the evidence showed an alarming pattern of valuing contracts at just a hair below the board-approval trigger of

---

[3] Defendant does not challenge the trial court's finding that Mullins and defendant were accomplices, thereby forfeiting any such contention on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *People v. Falletti*, 2012 IL App (4th) 120107, ¶ 21 (points not argued on appeal are forfeited).

$25,000; designating contracts as sole-source that did not seem to require any specialized skill whatsoever; awarding those contracts to companies that, to say the least, did not appear uniquely qualified to perform them; rushing payments to those companies before they had even begun work; and either personally profiting from the awarding of those contracts or enriching Mullins, defendant's accomplice. And beyond all of that, these vendors had either done no work at all on the contracts or, at most, negligible work that could be reasonably viewed as mere window dressing.

¶ 194　　Taking the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found, from this evidence, that defendant intended to steer these contracts to vendors with the intention that the vendors would not perform the work. See *Ross*, 229 Ill. 2d at 272.[4]

¶ 195　　　　　　　　　　　　　　2. Value of Property

¶ 196　　Defendant also challenges the sufficiency of the State's evidence establishing that the value of the property she stole from the county exceeded $100,000. When a charge of theft of property exceeding a specific value is brought, the value of the property is an element of the offense to be resolved by the trier of fact. 720 ILCS 5/16-1(c) (West 2010); *People v. Perry*, 224 Ill. 2d 312, 320 (2007). Depending on the value of the property, theft may be punished as a misdemeanor or a Class 4, 3, 2, 1, or X felony. *Perry*, 224 Ill. 2d at 320. In this case, counts III and IV were Class X felonies because theft of government property exceeding $100,000 in value is a Class X felony. 720 ILCS 5/16-1(b)(6.1) (West 2010).

¶ 197　　As with any other element of the offense, the trial court's findings of fact on this point will be upheld unless we find that no rational trier of fact could have made this finding beyond a reasonable doubt. *Ross*, 229 Ill. 2d at 272.

¶ 198　　Defendant does not argue that the contracts taken together were worth less than $100,000 or that she should not be held accountable for the value of certain contracts because the State failed to prove her involvement with those contracts. Instead, defendant argues that, with respect to the seven vendors to whose testimony the parties stipulated, "several indicated that

_____

[4]Arguably, it was not necessary for the State to even prove that the contracted work was not intended to be performed; the fact that the work was procured through fraud may have been enough, by itself, to show intent to deprive the county of the "use or benefit" of its money. In *People v. Haissig*, 2012 IL App (2d) 110726, ¶¶ 23, 35, this court held that employees of Abbott Laboratories, who had an undisclosed interest in an outside vendor that should have disqualified that vendor from receiving contracts from Abbott, committed theft by deception when that outside vendor obtained a contract from Abbott, *even though that outside vendor performed the agreed-upon work to Abbott's satisfaction*. The court reasoned that the "use or benefit" of the company's money was to procure a vendor that legitimately deserved the business, not one that procured the work through fraud or deception, so it was irrelevant that the vendor actually performed its end of the bargain. *Id.* ¶ 23. We do not reach the applicability of *Haissig* to this case for several reasons. First, the State never argued this theory of liability or so much as cited *Haissig*. Second, *Haissig* applied to private contracting, not a public-contract setting such as this one, and we are reluctant to extend *Haissig* to a different context without the benefit of adversarial presentation. Third, we have rejected defendant's argument on the question of intent in any event, so even if defendant is correct that the State was required to prove defendant's intent that the work would not be performed in this case, we have already found that the State presented sufficient evidence on this element.

some services had been performed" and that Anewishki testified that CGC and Arrei performed services under the contract.

¶ 199    Defendant fails to explain how, exactly, we should reduce the value of the property taken in proportion with the services rendered. The only evidence regarding the value of any services actually rendered came from Anewishki, who said that the work she did for the CGC contract was worth at least the full contract price. But the trial court expressly found her testimony to be incredible. And even if we discount the $24,975 CGC contract, the other contracts still well exceeded the $100,000 threshold.

¶ 200    Defendant also argues that "[t]here was no testimony from the remaining *** vendors regarding what services were performed." While the State did not present evidence of the other work performed under the contracts, that is because there was none to be found. As Blanchard testified, his investigation uncovered no substantive work done by anyone except the proposals and the Internet research done by Anewishki.[5]

¶ 201    Defendant has provided us no basis to disturb the trial court's finding on this point. We cannot say that the trial court's findings were so improbable or unsatisfactory that no rational factfinder would have adopted those findings. *Siguenza-Brito*, 235 Ill. 2d at 225; *Ross*, 229 Ill. 2d at 272.

¶ 202                                        3. Deception

¶ 203    Next, defendant argues that her conviction for theft by deception under count IV must be reversed because the State failed to prove that she deceived the county by, as the indictment alleged, "creating a false impression upon the [county] and others *** that there were legitimate vendor contracts between the [county] *** which the defendant did not believe to be true."

¶ 204    At the outset, we note that defendant has not clearly framed her argument on appeal. It appears that defendant does *not* argue that the State failed to prove that she engaged in any deception at all. Rather, it seems as though defendant is arguing that the State's proof failed to establish the specific deception alleged in the indictment. Generally, that kind of argument would be framed more properly as a claim that the State's evidence at trial fatally varied from the allegations of the indictment. See, *e.g.*, *People v. Montgomery*, 96 Ill. App. 3d 994, 995-96 (1981) (considering argument that State failed to prove that defendant assaulted specific person named in complaint as fatal variance argument rather than sufficiency-of-evidence argument). But defendant does not use the phrase "fatal variance" or cite any authority dealing with a fatal variance. Nor does defendant argue that the State's evidence was insufficient to prove any deception at all, or cite any authority regarding the sufficiency of the evidence. In fact, defendant does not cite any authority at all in support of her argument.

¶ 205    "A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument and research." *People v. Hood*, 210 Ill. App. 3d 743, 746 (1991). Accordingly, Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) requires that an appellant's brief contain "[a]rgument, which shall contain the contentions of the appellant and the reasons

_____

[5]While defendant contends that we should disregard Blanchard's testimony because it was inadmissible, we will consider it for purposes of the sufficiency of the State's evidence. We address the admissibility of Blanchard's testimony in a later section of this opinion.

therefor, with citation of the authorities and the pages of the record relied on." The failure to cite any authority or to articulate an argument will result in forfeiture of that argument on appeal. See, *e.g.*, *People v. Olsson*, 2014 IL App (2d) 131217, ¶ 16. As a result of defendant's failure to clearly state her argument or cite any relevant authority, defendant has forfeited this argument.

¶ 206    But even if we were to disregard defendant's forfeiture, we would find that the State presented more than sufficient evidence to prove the deception alleged in the indictment. "The term 'deception,' for purposes of the theft statute, means, *inter alia*, to knowingly '[c]reate or confirm another's impression which is false and which the offender does not believe to be true,' or '[f]ail to correct a false impression which the offender previously has created or confirmed,' or '[p]revent another from acquiring information pertinent to the disposition of the property involved.' " *People v. Kotlarz*, 193 Ill. 2d 272, 302 (2000) (quoting 720 ILCS 5/15-4(a), (b), (c) (West 1992)). The State sufficiently established defendant's deception under any of these definitions.

¶ 207    The State's evidence showed that defendant signed numerous letters justifying sole-source designations for work that was anything but unique and that praised the vendors' experience and the need to use these specific vendors for the projects when, in reality, either the vendors had no experience, they were not even existing companies, or they did not perform any work to justify the contracts. Once defendant got signature authority, she also signed off on 29A forms when, in fact, no such work had been performed or would be performed. Thus, the State presented sufficient evidence that defendant created a false impression that the contracts at issue were legitimate vendor contracts when, in fact, they were not, and prevented the county from knowing that these companies receiving government funds were not, in fact, qualified to obtain these contracts in the preferential manner that they did. See *id.*

¶ 208                        4. "With at Least Three Others"

¶ 209    Defendant also alleges that the State failed to prove that she committed theft "with at least three others known and unknown to the grand jury," as alleged in counts III and IV. But once again, defendant has failed to clarify whether she is arguing that the State's evidence fatally varied from the allegations in the indictment or whether the State presented insufficient evidence to prove that she should be held accountable for others' actions.

¶ 210    In fact, the entirety of defendant's argument is a single paragraph, most of which is a recitation of the trial court's finding that the State failed to prove conspiracy with respect to counts I, II, III, V, and VI. Defendant offers no explanation for why this finding should be binding with respect to counts III and IV. For the same reasons that we laid out above, defendant has forfeited this claim, and it merits no consideration on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Olsson*, 2014 IL App (2d) 131217, ¶ 16.

¶ 211                     5. Obtained or Exerted Unauthorized Control

¶ 212    Defendant next attacks her conviction in count III for theft (as opposed to theft by deception in count IV). As a reminder, a person commits theft when, among other things, she knowingly "[o]btains or exerts unauthorized control over property of the owner." 720 ILCS 5/16-1(a)(1) (West 2010). Defendant claims the State failed to prove that she obtained or exerted unauthorized control over the county's funds.

¶ 213    Yet again, defendant has failed to support this argument with any citations to the record or to any relevant authority, as required by Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013). Thus, as the State correctly points out, defendant has forfeited this argument. See, *e.g.*, *Olsson*, 2014 IL App (2d) 131217, ¶ 16; *People v. Sprind*, 403 Ill. App. 3d 772, 779 (2010).

¶ 214    Leaving aside defendant's forfeiture, we disagree with her argument that the State failed to prove that she exerted unauthorized control over the county's funds. Defendant claims that the State could not establish that she exerted unauthorized control over the county's money because "the payments made on the contracts were made by the Comptroller's Office."

¶ 215    Defendant's argument misses the point. It does not matter that the comptroller's office actually paid out the funds. The State was not required to prove that defendant, rather than the county, paid out the funds. Rather, it was required to show that defendant obtained or exerted control over the county's property (*i.e.*, the checks) and that such control was unauthorized.

¶ 216    We turn first to the question of control. For purposes of theft, the concept of obtaining or exerting control "includes but is not limited to the taking, carrying away, or the sale, conveyance, or transfer of title to, or interest in, or possession of property." 720 ILCS 5/15-8 (West 2010). This concept applies "to the initial taking or carrying away [citation], and *** the unauthorized possession need not begin at the time of the original taking." *People v. Snow*, 21 Ill. App. 3d 873, 876 (1974). It does not matter how briefly the defendant controlled the property, as long as the defendant did have control at some point. See *People v. Murray*, 262 Ill. App. 3d 1056, 1061 (1994) ("[T]o establish the crime of theft the State must prove that the defendant obtained 'unauthorized' control, *however brief*, over the property of another with the intent to permanently deprive the owner of the use and benefit thereof." (Emphasis added.)).

¶ 217    In this case, the evidence showed that, regardless of what entity wrote the checks, all of the funds were, at some point, either in defendant's control or in the control of her accomplice. With respect to the money from the CGC and Arrei contracts, those funds were put into bank accounts controlled by defendant. Abbasi also testified that he delivered the checks made out to CGC, Arrei, Render, and Peery to defendant, giving her actual, physical possession of the county's property. That her possession of these checks may have arisen after the initial taking does not defeat her conviction. Likewise, Mullins, whom the trial court found to be defendant's accomplice, physically possessed and delivered checks to Borner, Demos, Peery, and Render. Thus, either defendant or her accomplice possessed the county's property at some point.[6]

¶ 218    We now turn to the question of whether defendant's control was unauthorized. While the term "unauthorized" is not defined for purposes of theft, the definition of "owner" sheds some light on when control will be authorized. " '[O]wner' means a person, other than the offender, who has possession or any other interest in the property involved, even though such interest or possession is unlawful, and *without whose consent the offender had no authority to exert*

---

[6]Because we have found that defendant obtained control of county money either through the deposit of such money into her company's accounts, by her physical possession of the CGC, Arrei, Render, and Peery checks, or by her accomplice Mullins's physical possession of the Borner, Demos, Peery, and Render checks, and because the sum value of all of this money far exceeds the $100,000 threshold to support her conviction, we need not reach the more complicated question of whether defendant "exerted *** control" of the money by virtue of her authorization of the vendor contracts in her official capacity with the county.

*control over the property*." (Emphasis added.) 720 ILCS 5/15-2 (West 2010). Thus, the property's owner is one who can give authority to the defendant to control the property; the defendant may be said to exercise authorized control when its owner gives consent. There is no argument here that a governmental entity could not be such an owner for the purposes of the theft statute, and of course it could be. See, *e.g.*, *Kotlarz*, 193 Ill. 2d at 305 (state toll highway authority was "owner" of funds that were part of private company's purchase of tollway land that were diverted to defendant under fraudulent commission scheme).

¶ 219 In the context of employees accused of theft, whether the employee's conduct is authorized hinges on the scope of the employee's authority. For example, in *People v. Schueneman*, 320 Ill. 127, 128 (1926), the defendant was a bookkeeper for a corporation called "O. D. Jennings & Co." As bookkeeper, his duties included depositing the corporation's funds into the bank. *Id.* at 129. The defendant had taken some of the corporation's money. *Id.* At trial, the defendant sought to introduce evidence that O.D. Jennings, the president of the corporation, gave him a check and instructed the defendant to deliver it to a United States congressman as a bribe, but the trial court denied admission of that evidence. *Id.* at 130-31.

¶ 220 On appeal, the defendant argued that he should have been able to present evidence of Jennings's instructions to show that his possession of the corporation's money was authorized. *Id.* at 132. The Illinois Supreme Court disagreed, finding that Jennings's instructions could not have authorized the defendant to take the corporation's money:

> "The ownership of the property was alleged to be in O. D. Jennings & Co., a corporation. O. D. Jennings was not the corporation but only president and general manager. He had no more right to misappropriate and convert to an unlawful use the property of the corporation than the [defendant], and he could not confer any such right on the [defendant]. The facts proposed to be proved constituted a conspiracy between Jennings and the [defendant] to take the money of the corporation for the purpose of bribing a congressman, defrauding the government, and defrauding the corporation itself by the issue of checks to employees for money, a part of which was to be returned to Jennings personally, for his own use. The proof that the money of O. D. Jennings & Co. was taken for such purposes by the order and direction of the president of the company would have constituted no defense for the [defendant]." *Id.*

In other words, the defendant's taking of the corporation's money was not authorized because it was outside his authority to do so, and not even the president of the company could vest him with such authority.

¶ 221 Similarly, in *People v. Hajostek*, 49 Ill. App. 3d 148, 149 (1977), the defendant was a truck driver for a township who, as part of his duties, was permitted to use the township's truck to deliver rock from a quarry to spread on township roads. But the "defendant did not have the authority to deliver township gravel to private individuals and did not have the authority to use the township truck for private purposes." *Id.* at 150. The evidence at trial showed that the defendant used the truck to deliver gravel to a private individual in exchange for a fee. *Id.* The court held that the defendant's use of the truck was unauthorized because "the use of the township truck for private purposes was beyond the scope of [the] defendant's lawful authority." *Id.* at 152.

¶ 222 By contrast, in *People v. Lewandowski*, 43 Ill. App. 3d 800, 804-05 (1976), the court held that the State failed to prove that the defendant's exertion of control over federal government property was unauthorized where it was unclear whether the federal government's rules

permitted the defendant to resell the property. The defendant in *Lewandowski* was a purchasing agent for a college who, as part of his duties, bought surplus federal government property for the college. *Id.* at 800-01. The evidence showed that the defendant and his codefendant agreed to purchase some of the property and resell it to third parties at a profit, which the defendant would then return to the college. *Id.* at 801. The court held that the State failed to prove that defendant intended to exert unauthorized control of the property because the State failed to show that the federal government prohibited the surplus property to be resold to third parties. *Id.* at 804-05. The court noted that, if the federal government's rules gave the defendant "authority to *** dispose of the property to [his] best advantage, whether by cannibalization, trade[-]in or sale, then *** the intention to exert unauthorized control was not established." *Id.* at 805.

¶ 223    Each of *Schueneman*, *Hajostek*, and *Lewandowski* show that the issue of unauthorized control depends on the scope of the defendant's authority, which depends on the authority given to him or her by the property's owner. Only the property's owner can give the defendant consent to obtain or exert control over his or her property.

¶ 224    In this case, Cook County owned the property (*i.e.*, the funds given to the vendors). While defendant may have possessed the authority to sign justification letters and to sign off on invoices generally, she did not have the authority to misrepresent vendors' qualifications in justification letters or sign off on payments to companies that had no intention of performing any work. Nor did defendant have the authority to accept kickbacks for steering phony contracts to vendors. And as shown by *Schueneman*, even if defendant's superior had directed defendant to sign these specific justification letters—which defendant has never claimed, nor did the evidence demonstrate—her superior could not vest her with authority to do so, since the county itself owned the property, not any county official.

¶ 225    Notably, county rules permitted sole-source contracts to be awarded only "when the contract requires a contractor with a specialized skill or service or there is only one economically feasible source for the item or services." Cook County Ordinance 07-O-47 (approved July 10, 2007). Viewing the evidence in the light most favorable to the State, the trial court rationally concluded that the contracts at issue in this case did not require any specialized skill or service that would have justified the evasion of competitive bidding. In other words, the trial court found that the use of sole-source contracts for these vendors contravened county rules and regulations on competitive bidding. And, if any county "officer or employee" contracts for any services "contrary to the rules and regulations" governing competitive bidding, "such *** contract shall be void and of no effect." 55 ILCS 5/5-36008 (West 2010). In other words, no county employee, including defendant, could have made a contract in violation of county procurement regulations. By assisting in the formation of sole-source contracts that should have been subjected to competitive bidding, defendant acted outside the scope of her authority. Her actions could not have been authorized.

¶ 226    Defendant claims that her acts were authorized because, while there was evidence that she contributed to the issuance of checks being expedited, other county officials knew the checks were being issued and could have stopped the process. But the fact that others could have intervened to stop defendant's criminal activity does not make it authorized. No person could have given her the authority to exert control over the county funds except the county. While her position as deputy chief of staff may have authorized her to make decisions regarding the expenditure and use of county funds, she had no authority to deliver funds to unqualified

vendors pursuant to contracts that the county would not have entered into had she not misrepresented their qualifications.

¶ 227 For all of these reasons, we hold that the State presented sufficient evidence to convict defendant of theft under counts III and IV.

¶ 228                            B. Sufficiency of Evidence of Money Laundering

¶ 229 Defendant next challenges her conviction for money laundering. Relevant to this case, a person commits money laundering:

> "(1) when, knowing that the property involved in a *financial transaction* represents the proceeds of some form of unlawful activity, *he or she conducts or attempts to conduct such a financial transaction* which in fact involves criminally derived property:
>
> > ***
>
> (B) where he or she knows or reasonably should know that the financial transaction is designed in whole or in part:
>
> > (i) to conceal or disguise the nature, the location, the source, the ownership or the control of the criminally derived property[.]" (Emphases added.) 720 ILCS 5/29B-1(a)(1)(B)(i) (West 2010).

¶ 230 The trial court found that the State proved money laundering via the evidence showing "money going through this Shorty Capone/Terrell Harris and some coming back to her own company." The money "coming back to [defendant's] own company" refers to the $5000 check that Beatbangers, Harris's company, wrote to CGC, defendant's company, on April 28, 2010, after Cook County had issued checks to Alliance and Urban Rapport, two other companies related to Harris.

¶ 231 In light of our above finding that the State proved defendant guilty of theft of county funds beyond a reasonable doubt, there can be no dispute that the county funds dispersed to Harris's companies were criminally derived property or that defendant knew that the property had come from illegal activity. The only questions remaining, then, are whether defendant conducted a financial transaction and whether defendant knew or should have known that the transaction was designed to conceal or disguise the stolen money.

¶ 232 Under the plain language of the money laundering statute, defendant conducted a financial transaction when she deposited the $5000 Beatbangers check into CGC's bank account. A "'financial transaction' *** includes a *deposit*, withdrawal, transfer between accounts, exchange of currency, *** or any other payment, transfer or delivery by, through, or to a financial institution." (Emphasis added.) 720 ILCS 5/29B-1(b)(1) (West 2010). And a person "conducts" a financial transaction when he or she "initiat[es], conclud[es], or participat[es] in initiating or concluding a transaction." 720 ILCS 5/29B-1(b)(5) (West 2010). Defendant's deposit of the $5000 check, representing a kickback of part of the stolen county funds, was the conclusion of a financial transaction.

¶ 233 With respect to defendant's knowledge of the concealment or disguise of the money, we have found no helpful Illinois case law. But we need not define the outer parameters of this statutory language to conclude that, in this case, the State met its burden of proving that the financial transaction was designed to conceal the source of the criminally derived property.

¶ 234    Here, defendant accepted county money and funneled it through her ostensibly legitimate business's account. Moreover, the fact that the county money came back to her from Beatbangers, a company for whom CGC had previously performed work, suggests that defendant was attempting to conceal the kickback as a payment for legitimate work CGC had done for Beatbangers. Viewing the evidence in the light most favorable to the State, the trial court properly concluded that defendant knew that the deposit of the check into CGC's account was designed to conceal its source.

¶ 235    And if we were to look to foreign authorities for guidance, we would reach the same conclusion. The federal money laundering statute, like Illinois's money laundering statute, requires the government to prove that a defendant knew that a transaction was "designed in whole or in part *** to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i) (2006). Because the Illinois and federal money laundering statutes contain identical language, we may resort to federal case law as persuasive authority in interpreting our money laundering statute. See, *e.g.*, *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 27 (citing federal case law as persuasive authority where those decisions "interpret[ed] the same language as is contained in [Illinois's] class action statute").

¶ 236    Under federal law, evidence of a purpose to conceal can be shown in many ways, including:

> " 'statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.' " *United States v. Richardson*, 658 F.3d 333, 340 (3d Cir. 2011) (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1475-76 (10th Cir. 1994)).

Moreover, "funneling cash through an ostensibly legitimate business *** is ordinarily sufficient to prove a design to conceal the nature and source of the money." *Id.* at 341.

¶ 237    Our application of the Illinois money laundering statute to the facts of this case is thus consistent with federal courts' interpretation of identical language in the federal statute. The kickback from Terrell Harris to defendant—via a payment from Harris's company, Beatbangers, to defendant's company, CGC—was structured in such a way to give the appearance of legitimacy to what, in fact, was a kickback for steering government contracts to Harris.

¶ 238    But defendant maintains that the State failed to prove her guilty of conducting the financial transaction that was specified in the indictment. It is true that count VII of the indictment, charging money laundering, specified only one financial transaction: "placing funds in the client trust fund account of 'Individual N' who then paid out the funds to others known and unknown to the grand jury." Based on the evidence at trial, it is undisputed that "Individual N" was Ramsen Isaac, Terrell Harris's attorney.

¶ 239    Defendant's argument is unclear and poorly defined. She ignores the fact that the trial court did not base its finding of guilt on Isaac's transfer of funds through his IOLTA; the court based it on the money "coming back to [defendant's] own company," *i.e.*, the $5000 check that Beatbangers wrote to CGC. But she makes no argument that the trial court's finding of guilt based on evidence not specified in the indictment constituted a fatal variance from the

indictment or that the variance prejudiced her. See, *e.g.*, *People v. Burdine*, 362 Ill. App. 3d 19, 23-24 (2005) (argument that evidence supporting conviction differed from allegations of indictment is fatal variance argument).

¶ 240   Instead, defendant cites *People v. Fields*, 339 Ill. App. 3d 689, 698 (2003), for the notion that when the State charges a defendant with money laundering, it must specify the acts constituting the financial transaction. But we do not see the relevance of *Fields* in this context. *Fields* dealt with the sufficiency of an indictment where the defendant has filed a pretrial motion to dismiss (*id.* at 696), meaning that the indictment had to strictly comply with the requirements of section 111-3(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(a) (West 2000)). See *People v. Wade*, 2015 IL App (3d) 130780, ¶ 34 ("Where a defendant challenges an indictment prior to trial, the indictment must strictly comply with the requirements set forth in section 111-3."). In this case, defendant filed no pretrial motion challenging the allegations in count VII. Her attack on the sufficiency of the indictment at this stage requires her to demonstrate that the allegations of the indictment were so vague that they deprived her of an opportunity to prepare her defense or placed her at risk of facing a future prosecution for the same conduct. *People v. DiLorenzo*, 169 Ill. 2d 318, 322 (1996).

¶ 241   Yet defendant makes no argument that the allegations of the indictment misled her in preparing her defense. And even if she had, the record would not support that argument, as defendant's trial counsel prepared an explanation for the $5000 check from Beatbangers to CGC—that it represented prior work that CGC had done for Beatbangers. Nor do we find that defendant would be subjected to double jeopardy where the record shows that the $5000 check was litigated at trial. See *People v. Guerrero*, 356 Ill. App. 3d 22, 29 (2005) ("A prior prosecution can easily be proven by reference to the record, thereby protecting a defendant from being placed in double jeopardy.").

¶ 242   Ultimately, we are left guessing as to the basis of defendant's precise challenge to her money laundering conviction. "[A] reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented." (Internal quotation marks omitted.) *Barlow v. Costigan*, 2014 IL 115152, ¶ 52. An appellant's failure to argue a point "results in forfeiture of the issue," and "[a]n issue that is merely listed or included in a vague allegations of error is not 'argued.' " *Vancura v. Katris*, 238 Ill. 2d 352, 369-70 (2010); see also Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (requiring appellant's brief to contain "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on").

¶ 243   For all of these reasons, we find sufficient evidence to support defendant's conviction for money laundering.[7]

---

[7]We also note that defendant makes no meaningful argument that we should reduce her conviction based on the value of the money laundered. See 720 ILCS 5/29B-1(c) (West 2010) (sentence ranges for money laundering depend on amount of money laundered). Her only claim on this point is a single sentence reading, "[T]he CGC and Arrei transactions were not 'in excess of $100,000' as charged in Count 7." Once again, we cannot ascertain if defendant is making a variance argument or a sufficiency of the evidence argument and we find that defendant has forfeited any claim that her sentence should be reduced. See *People v. Nieves*, 192 Ill. 2d 487, 503 (2000) (defendant forfeited argument where entire argument consisted of "a single sentence").

¶ 244                    C. Sufficiency of Evidence of Unlawful Stringing of Bids

¶ 245        Next, defendant challenges the sufficiency of the State's evidence to prove count XV, alleging the unlawful stringing of bids. A defendant commits unlawful stringing of bids when he or she knowingly strings or assists in stringing any contract or job order with a unit of local government or school district for the purpose of evading that unit of government's bidding requirements. 720 ILCS 5/33E-18(a) (West 2010). " 'Stringing' means knowingly structuring a contract or job order to avoid the contract or job order being subject to competitive bidding requirements." 720 ILCS 5/33E-2(i-5) (West 2010).

¶ 246        Count XV alleged that defendant structured the contracts to avoid Cook County's competitive bidding requirements by "divid[ing] two contracts worth [$100,000] each into eight contracts, each worth over [$24,900] but under [$25,000] and the purpose for doing so was to evade the requirements for Cook County board approval." In convicting defendant of count XV, the trial court stated:

> "I find that the government has clearly met their burden of proof as to that. Dividing up these contracts to get them under the radar of the County Board to—in amounts under $25,000 has indeed been proven beyond a reasonable doubt. She's found guilty of Count 15 as well."

¶ 247        Defendant notes that dividing up the two larger contracts into smaller contracts under $25,000 was not evidence that she attempted to avoid *competitive bidding requirements*, because the evidence showed that pricing the contracts below $25,000 avoided *Cook County board approval*, whereas classifying the contracts as "sole source" avoided the competitive bidding process.

¶ 248        Defendant's underlying premise is correct. Deliberately structuring the contracts so that each of them fell below $25,000 only avoided county board approval; it did *not* avoid competitive bidding. Testimony at trial revealed that contracts below $25,000 would still be let for some form of competitive bidding. While many competitive bidding laws (if not most) do have monetary thresholds, in this case, the evidence showed that the $25,000 threshold had nothing to do with competitive bidding. It was only the designation of contracts as sole-source contracts that avoided competitive bidding. The State concedes as much.

¶ 249        But other than pointing out that avoiding board approval is different than avoiding competitive bidding, defendant does not explain what remedy should result, nor does she couch this point in a proper legal argument. She has never claimed that the indictment was deficient—not pretrial, not posttrial, and not even on appeal. Nor does she argue a fatal variance, that the sole-source nature of the contracts impermissibly varied from the allegations of the indictment and cannot be relied on to support her conviction. As we have repeatedly found above, defendant's failure to present any cogent argument or cite any relevant authority compels us to find that she has forfeited any such claims on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *Olsson*, 2014 IL App (2d) 131217, ¶ 16.

¶ 250        Nor does defendant argue that she suffered any prejudice from any deficiency in the indictment or variance in proof. We would find none, in any event. Virtually every count in this case was premised on defendant's attempts to steer contracts to her chosen companies and to do so in secrecy. Her attempts to conceal these transactions necessarily included *both* avoiding competitive bidding *and* avoiding the scrutiny of the county board. There was no question, throughout the trial, that defendant would be litigating the validity of the sole-source

justification letters; it was not as if this evidence came out of the blue, related only to count XV, and caught defendant off-guard.

¶ 251    Our supreme court has instructed us that " 'a reviewing court should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court judgment.' " (Emphasis in original.) *People v. Givens*, 237 Ill. 2d 311, 323 (2010) (quoting *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379, 386 (1978)). We will not review the sufficiency of the indictment, or any possibly fatal variance between the indictment and the proof, without a specific legal argument directing us to do so, supported by some citation to case law and the record.

¶ 252    To the extent defendant is arguing simply that the State failed to prove her guilty beyond a reasonable doubt on this count, that argument fails. The evidence of her guilt on bid stringing was overwhelming. The evidence showed that defendant went to painstaking efforts to falsely extol the virtues of the vendors in this case to justify the use of sole-source contracts, thereby avoiding competitive bidding. And Abbasi testified that he told defendant that sole-source contracts would avoid the necessity of competitive bidding. Thus, a rational trier of fact could easily find that defendant designated the contracts as "sole source" with the intent to avoid the county's competitive bidding requirements.

¶ 253    We thus find that the evidence was sufficient to support defendant's conviction on count XV and find any other argument regarding this count to be forfeited.

¶ 254                                      D. Patrick Blanchard's Testimony

¶ 255    Next, defendant contends that the trial court erred in admitting the testimony of Patrick Blanchard, Cook County's inspector general. Specifically, defendant claims that Blanchard's testimony was inadmissible because it was hearsay, it included improper opinions, it was not based on Blanchard's personal knowledge, and it violated defendant's right to confront the witnesses against her. We address each of defendant's arguments.

¶ 256                                               1. Hearsay

¶ 257    Defendant argues that Blanchard's testimony consisted of inadmissible hearsay. Defendant notes that Blanchard only learned about the vendor contracts through his interviews of the vendors, employees of Cook County, and the contents of various records that he subpoenaed during his investigation.

¶ 258    Hearsay is generally inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). Illinois Rule of Evidence 801(c) (eff. Jan. 1, 2011) defines hearsay as an out-of-court statement offered in evidence to prove the truth of the matter asserted. Thus, when testimony about an out-of-court statement is not used to prove the truth of the matter asserted in the statement, that testimony is not hearsay. *People v. Williams*, 181 Ill. 2d 297, 313 (1998). One example of such nonhearsay testimony is when the prosecution offers testimony "for the limited purpose of showing the course of a police investigation where such testimony is necessary to fully explain the State's case to the trier of fact." *Id.* When an officer testifies as to his investigation, he may refer to the existence of conversations "even if a logical inference may be drawn that the officer took subsequent steps as a result of the substance of that conversation." *People v. Jones*, 153 Ill. 2d 155, 160 (1992).

¶ 259    Here, Blanchard testified that he had conversations with various witnesses and reviewed various documents in order to explain the steps of his investigation. Thus, the State used his

testimony to prove the steps leading from the initial investigation to defendant's arrest, not to prove the truth of any of the statements witnesses made to Blanchard during his investigation.

¶ 260    And the trial court only considered his testimony for that limited purpose. At the hearing on defendant's posttrial motion, the court said that it had considered Blanchard's testimony only to "explain[ ] how the matter got from matters happening within the county to law enforcement's attention." The court expressly said that it "didn't accept [his testimony] for the truth of the matter asserted, just [for] why he kept doing what he kept doing and [why] he kept investigating further."

¶ 261    On review of a bench trial, we presume that the trial judge considered only properly admitted evidence unless the record affirmatively rebuts that presumption. *People v. Naylor*, 229 Ill. 2d 584, 603-04 (2008); *People v. Eddmonds*, 101 Ill. 2d 44, 65-66 (1984). Here, where the trial court expressly indicated that it considered Blanchard's testimony solely as an explanation of the steps of his investigation, we cannot say that this presumption has been rebutted.

¶ 262    Moreover, even if Blanchard's testimony did consist of inadmissible hearsay, we would find that any erroneous consideration of that testimony by the trial court would be harmless. Each of the conversations relayed by Blanchard were conversations with witnesses who either testified to the same information at trial or to whose testimony defense counsel stipulated. Similarly, the State introduced each of the documents that Blanchard referenced during his testimony at trial without objection from defendant. Thus, even if the court did consider Blanchard's testimony regarding his conversations with witnesses for the truth of the matter asserted, that evidence would have been cumulative of the properly admitted evidence at trial.

¶ 263    For example, defendant complains that Blanchard testified about "competitive bidding and the use of sole source contracts and justification letters," but those matters were explained by Triche-Colvin, Goldsmith, Abbasi, and other witnesses. Defendant complains that Blanchard said that "little or no work was performed by the vendors under the contracts," but that evidence was also revealed through the stipulations of numerous vendors, including Searcy of the IHDC, as well as Anewishki's testimony regarding her work. Defendant says that Blanchard testified that Harris and Beatbangers had a relationship with defendant, but Anewishki testified to the same information. Defendant complains that Blanchard said that the approval process for these contracts deviated from the normal process, but that same evidence was introduced via the employees and officers of Cook County who testified at trial. Similarly, defendant claims that Blanchard should not have testified that it was unusual for vendors to be paid before performing work, even though the parties stipulated to Kravitz's testimony as to the same fact.

¶ 264    Defendant also notes that Blanchard testified that the Federal Bureau of Investigation had subpoenaed records showing that there was "no activity" on Arrei's account from January 1, 2009, until January 2010, which the State used to prove Arrei's illegitimacy. While those records themselves were not presented at trial, in substance, the same evidence was introduced via Arrei's bank records at trial, which showed that very little money was kept in Arrei's accounts.

¶ 265    Defendant claims that the admission of Blanchard's testimony was not harmless because it "was the main evidence relied on by the State to prove that the work was not done, which was central to all of the charges." There are two problems with this argument. First, defendant does not explain why it was improper for Blanchard to testify that he did not uncover any

substantive work done by the vendors during his investigation. That testimony could not possibly be hearsay because Blanchard was not recounting a *statement* by anyone. See Ill. R. Evid. 801(a), (c) (eff. Jan. 1, 2011) (hearsay rule only applies to statements, *i.e.*, oral, written, or nonverbal assertions). Instead, Blanchard testified that, as he reviewed documents, he did not find any work other than the proposals the various vendors had submitted and Anewishki's Internet research. That is not hearsay.

¶ 266 Second, other pieces of evidence established the absence of work by most of the vendors. The evidence demonstrated that each of the vendors was paid so rapidly that they could not have performed any work before they were paid. The stipulations to the testimony of Borner, Demos, Searcy, and Peery all said that they performed little or no work under their contracts. Anewishki testified that she performed no work for Arrei other than completing its proposal for a contract. While she said that she performed the work under the CGC contract, the trial court did not accept her testimony that the work she described was the work for which CGC had been given the contract.

¶ 267 Because Blanchard's allegedly inadmissible hearsay testimony was cumulative of other, properly admitted evidence at trial, any error in the admission of that testimony would have been harmless in any event. See, *e.g.*, *People v. Yancy*, 368 Ill. App. 3d 381, 385 (2005) ("[T]he admission of hearsay *** testimony is harmless error when it is merely cumulative." (Internal quotation marks omitted.)).

¶ 268                                         2. Lay Opinion

¶ 269 Next, defendant argues that Blanchard improperly offered his opinion about various pieces of evidence even though he had not been qualified as an expert. Specifically, defendant contends that Blanchard improperly opined that the contracts at issue were not the type that would necessitate using sole-source vendors, that little or no work had been performed under the contracts, that the Arrei justification letter contained false statements, that defendant was "a very strong person," that the comptroller's office was understaffed, and that the involvement of both CGC and Arrei was a "red flag."

¶ 270 Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) provides:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) deals with the admission of expert testimony. There is no dispute that, in this case, the State did not attempt to have Blanchard testify as an expert.

¶ 271 We will assume without deciding, for argument's sake, that Blanchard's testimony constituted improper opinion evidence. Even making that assumption, however, we conclude that the admission of his testimony would have been harmless.

¶ 272 As we noted above, the trial judge presiding over a bench trial is presumed to consider only admissible evidence, absent evidence in the record showing that the judge considered improper evidence. *Naylor*, 229 Ill. 2d at 603-04. In this case, the trial court did not make any findings that indicated that it considered Blanchard's opinions as evidence of defendant's guilt. And at

the hearing on defendant's posttrial motion, the trial court clarified that it considered Blanchard's testimony only as evidence of the investigation leading to defendant's arrest. Because the trial court did not consider this allegedly improper evidence in finding defendant guilty, any error in its admission was harmless. See, *e.g.*, *People v. Leach*, 2012 IL 111534, ¶ 149 (improper admission of opinion harmless at bench trial where opinion "had a negligible effect on [the court's] verdict"); *People v. Soteras*, 295 Ill. App. 3d 610, 628 (1998) (even if court erred in admitting expert opinion at bench trial, that error was harmless because "[t]he trial court did not rely on the opinion of the *** expert in determining defendant's guilt").

¶ 273 Defendant offers no explanation for how the improper opinion evidence prejudiced her, except to say that it was important evidence establishing that none of the vendors performed work. But the fact that Blanchard did not find examples of work during his investigation was not an opinion; it was a fact. We reject defendant's argument that the admission of Blanchard's testimony constituted reversible error.

¶ 274                 3. Personal Knowledge and Confrontation Clause

¶ 275 Defendant also argues that Blanchard's testimony was not based on his personal knowledge. See Ill. R. Evid. 602 (eff. Jan. 1, 2011) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). But defendant's argument about personal knowledge essentially reiterates her hearsay and opinion objections to Blanchard's testimony. As we have already rejected those claims, we do not need to address them again under the rubric of Blanchard's personal knowledge.

¶ 276 Finally, defendant argues that Blanchard's testimony violated the confrontation clause because Blanchard testified to testimonial hearsay. See *Leach*, 2012 IL 111534, ¶ 77 (confrontation clause bars admission of testimonial hearsay under certain circumstances). But we have already concluded either that Blanchard's testimony was not hearsay or that its admission was harmless. We reach the same conclusions with respect to defendant's confrontation clause challenge; to the extent that any error occurred, it was harmless beyond a reasonable doubt. See, *e.g.*, *People v. Stechly*, 225 Ill. 2d 246, 304 (2007) (violations of confrontation clause via admission of testimonial hearsay subject to harmless-error analysis); *People v. Peoples*, 377 Ill. App. 3d 978, 986 (2007) (rejecting confrontation clause argument because evidence was not hearsay).

¶ 277                                 E. Excessive Sentence

¶ 278 Next, defendant challenges her sentence. She argues that the trial court "assumed the theft charges were Class X offenses and required at least a six year sentence." See 720 ILCS 5/16-1(b)(6.1) (West 2010) (theft of more than $100,000 of governmental property a Class X felony); 730 ILCS 5/5-4.5-25(a) (West 2010) (Class X felonies have range of 6 to 30 years' imprisonment). She claims that the trial court erred in making this assumption because the State failed to prove the value of the stolen property. We have rejected that argument above and, for that reason, reject defendant's argument regarding her sentencing range.

## F. One-Act, One-Crime

¶ 279

¶ 280    Finally, defendant contends, and the State agrees, that one of her theft convictions must be vacated under the one-act, one-crime doctrine. Under the one-act, one-crime doctrine, multiple convictions may not be entered for the same physical act. *People v. Miller*, 238 Ill. 2d 161, 165 (2010). When two convictions are entered for the same act, "sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170 (2009).

¶ 281    Here, the State predicated counts III and IV on the same act—defendant's theft of more than $100,000 of Cook County funds. Thus, one of those convictions must be vacated.

¶ 282    The State contends that we should vacate defendant's theft count (count III) and affirm her theft by deception count (count IV) because theft by deception is the more serious offense. Defendant claims that count III is the more serious offense.

¶ 283    When determining which offense is more serious under the one-act, one-crime doctrine, our supreme court has laid out a two-step approach. First, we must look to the plain language of the statutes defining the offenses to determine whether one offense has a greater punishment than another and consider the offense with the greater possible punishment to be more serious. *In re Samantha V.*, 234 Ill. 2d 359, 379 (2009). Second, if the punishments are the same, we consider which offense has the more culpable mental state. *Id.* If we cannot determine the more serious offense under either of these steps, then we must remand to the trial court to determine which offense is more serious. *Id.* at 379-80.

¶ 284    In this case, theft and theft by deception have identical sentencing ranges—they are both determined by the value of the property stolen. And they have the same mental state: an intent to permanently deprive the owner of the property of the use or benefit of the property. 720 ILCS 5/16-1(a)(1)(A), (a)(2)(A) (West 2010). Because we cannot determine which offense is more serious, we must remand to the trial court for that determination.

¶ 285    The State claims that "[c]ommon sense dictates" that theft by deception is more serious because it involves conduct "far more culpable and premeditated" than theft. We disagree. While the *acts* proscribed by the theft and theft by deception provisions differ, they require the same level of premeditation. And the State cites no authority for the notion that theft by deception is more serious than theft by exerting unauthorized control over property. We remand to the trial court for a determination as to which count—count III or IV—should be vacated.

## III. CONCLUSION

¶ 286

¶ 287    For the reasons stated, we affirm one of defendant's convictions for theft (counts III and IV), as well as her sentences for those offenses. We vacate one of her theft convictions pursuant to the one-act, one-crime doctrine and remand with directions to determine which of her two theft convictions is less serious and should thus be vacated. We affirm her convictions for money laundering (count VII) and unlawful stringing of bids (count XV).

¶ 288    Affirmed in part, vacated in part, and remanded.